[No. C056282. Third Dist. June 9, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES DANIEL HALLER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I., II. and III. of the Discussion.

**COUNSEL**

Carol A. Navone, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Carlos A. Martinez and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SIMS, Acting P. J.**—Defendant James Daniel Haller appeals following his conviction on multiple counts of criminal threats (Pen. Code, § 422),[1] stalking (§ 646.9, subd. (a)), and assault with a deadly weapon, a knife (§ 245, subd. (a)(1)). Defendant contends the trial court (1) erred in refusing to allow defendant to present evidence at the sentencing hearing, (2) abused its discretion in failing to strike one of two prior convictions, (3) abused its discretion in imposing consecutive sentences, and (4) imposed a cruel and/or unusual punishment under the state and federal Constitutions.

In the published portion of the opinion, we shall conclude defendant's sentence does not constitute cruel or unusual punishment. In the unpublished portion, we reject defendant's other contentions of error. We shall therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with (1) criminal threats (§ 422) against his ex-wife Jacqueline Runyon on June 25, 2004; (2) criminal threats against Runyon's husband, Jerry Cole, on June 25, 2004; (3) criminal threats against Runyon on June 26, 2004; (4) criminal threats against Cole on June 26, 2004; (5) assault on Cole with a deadly weapon (§ 245) on June 26, 2004; and (6) stalking (§ 646.9) Runyon between May 24, 2004, and June 28, 2004, by willfully, maliciously and repeatedly following her, harassing her, and making

---

[1] Undesignated statutory references are to the Penal Code.

a credible threat with the intent that she be placed in reasonable fear for the safety of herself and her family. The information also alleged defendant had two prior serious felonies (§ 1170.12)—a June 2004 conviction for criminal threats, and a February 2000 conviction for battery with serious bodily injury (§ 243, subd. (d))—and a prior prison term (§ 667.5, subd. (b)) for the 2000 conviction. The information also alleged, for sentence enhancement purposes under sections 1170.12 (three strikes law), 667.5 (same), and 646.9 (stalking after conviction for criminal threats or spousal abuse): A 2004 felony conviction for criminal threats (§ 422); a 2000 felony conviction for battery with serious bodily injury (§ 243, subd. (d)); and a prior prison term (§ 667.5) related to the 2000 conviction.

Evidence adduced at trial included the following:

Defendant had a history of domestic violence during his marriage to Runyon. In 1994, he punched her in the mouth, drawing blood and loosening her teeth (resulting in a misdemeanor spousal abuse conviction). In 1997, he threw an ashtray at her, hitting the back of her neck. In 1998, he punched her in the mouth (resulting in a misdemeanor spousal abuse conviction). When Runyon tried to leave defendant, he told her that if he could not have her, "nobody would." Runyon eventually divorced defendant. Despite a restraining order, defendant would not let go. In February 2003, he loitered outside Runyon's workplace. In March and May 2003, he went to her house and left when she called the police. In June 2003, Runyon was sleeping at the home of friends when she awoke to find defendant standing over her. Her son dragged him out of the house. Later, defendant drove by the house and said they "better have fire insurance." He eventually pled no contest to stalking and criminal threats and was placed on probation with credit for time served.

Meanwhile, Runyon met Cole in October 2003, moved in with him in November 2003, and later married him in November 2004.

In June 2004, defendant, freshly released from custody on the 2003 stalking, began leaving threatening phone messages for Runyon and Cole. Defendant called 40 to 50 times a day and threatened Cole with death, dismemberment, sodomy, and torture. On June 23, 2004, Runyon was in the yard hanging laundry when she heard defendant's voice say, "Oh, so that's where you're living." She ran inside without seeing defendant.

On June 25, 2004, defendant made multiple threatening phone calls. In one call, he said he was going to come over, rape Cole, "cut his thing off and stick it down his throat and make [Runyon] watch." Around 8:00 p.m., defendant appeared at Runyon's home with their teenage son Joshua and yelled, "Jerry, come out or I will kill you." Joshua broke a window with his

fist. Defendant and Joshua left when the police were called. Runyon could not sleep that night because she was afraid defendant would break into her home. Cole sat on the couch all night, keeping guard. The next day, he had friends come to keep guard so he could sleep.

Defendant continued his threatening phone calls all day on June 26, 2004. The answering machine recorded the following call from defendant at 9:42 p.m.: "Jackie and Jerry you know what? I am gonna come and stick that glass pipe right up your fuckin' hot ass and cut your nuts off and just your fuckin' asshole puckers up and shove 'em down her fuckin' throat Jerry. . . . [D]on't go to sleep, 'cause you know what? I'm comin' you mother fucker, I'm fuckin' comin'. Can you hear that Jackie? You fucked up. You burnt the bridge. You fuckin' bitch. . . . I'm gonna fuck your fuckin' world up, let's bring the mother fuckin', move in that substation, move in that mother fuckin' substation 'cause you know what Jerry? And you know what Jackie? And Jerry you know what? I think it would be best to kick her fuckin' ass out right now 'cause that's my fuckin' wife and I'm coming to fuckin' take her."

Defendant immediately called back and said simply, "Hell." Two minutes later, he called and said, "I'm gonna fuckin' fuck you guys' world up." One minute later, he called again and said, "Jerry Cole and Jackie Haller you fuckin' Jerry, you know it dude, Jackie you know what? You, you, you're, you're a chicken shit, you have no heart and it just floored me you loved me twenty-two fuckin' years and then you that, that shit you're in love with that mother fucker, I'm gonna take that glass pipe Jackie 'cause his asshole's quiverin' while I'm fuckin' him right in front of you."

Defendant called again and said he was coming over to kill them. Runyon called the police, Cole retrieved a shotgun from the bedroom, and Cole's brother-in-law (Mike) went outside with a baseball bat.

Defendant showed up, brandishing a knife with a 12-inch blade. Mike called out a warning that defendant had a knife. Cole did not hear what Mike said but came out the front door with the shotgun, saw defendant with a shiny object in his hand, and said, "Freeze motherfucker." Defendant did not answer but kept moving. Cole fired the gun once, hitting defendant in the groin. Defendant fell to the ground. From a sitting position, he tried to throw the knife, crawled to where it fell and tried to throw it again. Police recovered a knife at the scene.

Defendant testified in his own behalf. He did not deny the threatening phone calls but says he was intoxicated and does not remember specifics. He went to the victims' home to try to "smooth everything over" and "maybe try to reconcile and get back together with her." He denied bringing a knife. He recalled only exchanging words with a man, and seeing the flash of a gun.

Defendant's son Joshua, who did not live with Runyon, his mother, testified about breaking the window. He was at a market with his father when he saw a boy riding a bicycle belonging to Joshua's brother (who lived with their mother). Joshua asked where the boy got the bike and thus learned where Joshua's mother and brother were living. Joshua told defendant to stay out of sight and tried to return the bike to his brother but was rebuffed by his brother and mother. Joshua was angry that they wanted nothing to do with him and therefore hit the window.

The defense presented an acquaintance of Cole's who testified that Cole bragged about contriving a self-defense situation to send his wife's ex-husband to prison for life. The acquaintance had had his own altercation with Cole.

The jury found defendant guilty on all counts. The trial court found true the allegations of prior convictions and prior prison term.

In sentencing defendant in June 2007, the trial court selected Count Five (assault with deadly weapon) as the principal term and imposed a sentence of 25 years to life in prison. The court imposed a consecutive sentence of 25 years to life for Count One (criminal threats to Runyon on June 25, 2004), and the same for Count Three (criminal threats to Runyon on June 26, 2004). Each of these three terms was enhanced by one year for the prior prison term (§ 667.5). On Counts Two and Four (criminal threats to Cole), the court imposed concurrent terms of 25 years to life, enhanced by one year for the prior prison term. Sentence on Count Six (stalking) was stayed pursuant to section 654. The court thus sentenced defendant to life in prison with possibility of parole, with a minimum of 78 years.

Defendant committed these offenses while on probation for the 2004 conviction for criminal threats against Runyon (*People v. Haller* (Super. Ct. Shasta County, 2004, No. 03F3515)). The court revoked probation and sentenced defendant to four years eight months for the prior case, to be served consecutively to the sentence on the current case.

## DISCUSSION

I.–III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1080.

### IV. *Cruel and/or Unusual Punishment*

Defendant contends the aggregate sentence of 78 years to life in prison constitutes cruel and/or unusual punishment under the Eighth Amendment to the federal Constitution ("cruel and unusual punishments [shall not be] inflicted"), and article I, section 17, of the California Constitution ("Cruel or unusual punishment may not be inflicted or excessive fines imposed.").

■ Defendant complains he will not be eligible for parole for more than 77 years, i.e., when he is 119 years old. His only cited authority is *In re Cervera* (2001) 24 Cal.4th 1073 [103 Cal.Rptr.2d 762, 16 P.3d 176], which held the three strikes law does not allow a third strike felon, sentenced to life in prison with a minimum of 25 years, to be awarded prison conduct credits for use against the mandatory indeterminate term of life imprisonment or the 25-year minimum. The People do not challenge, and we accept for purposes of this appeal, defendant's assertion that he will not be eligible for parole until he is 119 years old. Section 3046[3] prescribes generally the minimum periods for parole eligibility. Section 3046 is subject to three strikes sentencing, such that a defendant is ineligible for parole during the minimum term of the three strikes sentence (§ 667, subd. (e)(2)). (*People v. Acosta* (2002) 29 Cal.4th 105, 113–114 [124 Cal.Rptr.2d 435, 52 P.3d 624].)

■ We shall conclude defendant's sentence does not constitute cruel and/or unusual punishment.

### A. *United States Constitution*

■ The Eighth Amendment prohibits imposition of a sentence that is "grossly disproportionate" to the severity of the crime. (*Ewing v. California* (2003) 538 U.S. 11, 20–21 [155 L.Ed.2d 108, 123 S.Ct. 1179]; *People v. Carmony* (2005) 127 Cal.App.4th 1066, 1076 [26 Cal.Rptr.3d 365] (*Carmony*).) In a noncapital case, however, successful proportionality challenges are " 'exceedingly rare.' " (*Ewing, supra*, 538 U.S. at pp. 20–21 [sentence of 25 years to life in prison for felony theft of golf clubs under California's three strikes law, with prior felonies of robbery and burglary, did not violate federal prohibition on cruel and unusual punishment].) In the rare

---

[3] Section 3046 provides in part: "(a) No prisoner imprisoned under a life sentence may be paroled until he or she has served the greater of the following: [¶] (1) A term of at least seven calendar years. [¶] (2) A term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole.

"(b) If two or more life sentences are ordered to run consecutively to each other pursuant to Section 669, no prisoner so imprisoned may be paroled until he or she has served the term specified in subdivision (a) on each of the life sentences that are ordered to run consecutively. . . ."

case where gross disproportionality can be inferred from (1) the gravity of the offense and harshness of the penalty, the court will consider (2) sentences imposed for other offenses in the same jurisdiction and (3) sentences imposed for commission of the same crimes in other jurisdictions. (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1005 [115 L.Ed.2d 836, 871, 111 S.Ct. 2680] [sentence of life in prison without possibility of parole, for possessing 672 grams of cocaine, was not cruel and unusual punishment].) "[I]t is only in the rare case where a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality that the second and third criteria come into play." (*People v. Meeks* (2004) 123 Cal.App.4th 695, 707 [20 Cal.Rptr.3d 445], citing *Harmelin v. Michigan, supra,* 501 U.S. at p. 1005 [115 L.Ed.2d at pp. 871–872] (conc. opn. of Kennedy, J.).)

### 1. Gravity of Offense/Harshness of Penalty

The gravity of offenses can be assessed by comparing the harm caused or threatened to the victim or society and the culpability of the offender with the severity of the penalty. (*Carmony, supra,* 127 Cal.App.4th at p. 1077.) *Carmony* was one of the rare cases where punishment was disproportionate. There, the defendant received a sentence of 25 years to life in prison for failing to update his sex offender registration within five days of his birthday, where he had registered a month before his birthday, was still at the same address, his prior felonies were committed long before the current offense, and the current offense was a nonviolent regulatory offense that posed no direct or immediate danger to society. (*Id.* at pp. 1078–1082.)

Here, the current offenses caused or threatened harm and violence to the victims. Defendant terrorized them with relentless phone calls threatening vile acts of violence. He disrupted their lives to such an extent that they were afraid to sleep. He displayed willingness to follow through with his threats by going to the victims' home with a knife.

Defendant suggests the prosecutor overcharged the case by charging six counts, because she told the jury in closing argument, "the main point of this case is actually Count 6, which is the stalking count. Kind of the cloud that everything goes within." Defendant says that (leaving aside the three strikes law) the other five counts were "wobblers," four of which (criminal threats) have an aggravated term of three years and therefore must be considered "low grade" felonies. The stalking count (with a prior stalking conviction) was punishable by two, three, or five years. (§ 646.9, subd. (c)(1), (2).) The assault count carried a maximum penalty of four years. Defendant says the

maximum penalty for all six counts imposed consecutively (which would violate § 654) would be nine years eight months (not counting the three strikes sentencing). However, we question defendant's calculations, and in any event it is ludicrous to view the criminal threats as low-grade felonies in light of defendant's actions in going to the victims' home armed with a knife and a stated intent to carry out his threats. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510 [84 Cal.Rptr.2d 638] [though crimes were wobblers in the abstract, they were dangerous under the circumstances].) Moreover, we do not view the current crimes in isolation but also consider defendant's recidivism, as we discuss *post*.

Defendant says the gunshot wound to his groin, necessitating surgical removal of his testicle, constitutes punishment that should be taken into account. He claims the verdict does not indicate whether Cole was justified in shooting defendant and it is doubtful the jury believed the shooting was necessary. Defendant points out he did not physically injure anyone. Defendant cites no authority supporting his position, and we see no reason why defendant should get a break in sentencing due to his injury (for which he can only blame himself) or his inability to carry out his threats (for which he cannot take credit).

In considering the harshness of the penalty, we take into consideration that defendant is a repeat offender whom the Legislature may punish more severely than it punishes a first-time offender. (*Ewing, supra*, 538 U.S. at pp. 24–26 [155 L.Ed.2d at pp. 119–120].) Yet we also have in mind that, because the penalty is imposed for the current offenses, the focus must be on the seriousness of these offenses. (*Witte v. United States* (1995) 515 U.S. 389, 402–403 [132 L.Ed.2d 351, 366, 115 S.Ct. 2199]; *Carmony, supra*, 127 Cal.App.4th at p. 1079.) "Past offenses do not themselves justify imposition of an enhanced sentence for the current offense. [Citation.] The double jeopardy clause prohibits successive punishment for the same offense. [Citations.] The policy of the clause therefore circumscribes the relevance of recidivism. [Citation.] To the extent the 'punishment greatly exceeds that warranted by the aggravated offense, it begins to look very much as if the offender is actually being punished again for his prior offenses.' [Citation.]" (*Carmony, supra*, 127 Cal.App.4th at p. 1080.)

Defendant argues the effect of his sentence is a life sentence without possibility of parole, because he will not be eligible for parole until he is 119 years old. (*In re Cervera, supra*, 24 Cal.4th at p. 1081 [third strike felon sentenced to life in prison with a minimum of 25 years could not have his minimum term of 25 years reduced with good conduct credits].) Defendant cites a concurring opinion by Justice Mosk in *People v. Deloza* (1998) 18 Cal.4th 585 [76 Cal.Rptr.2d 255, 957 P.2d 945], that a sentence is cruel and

unusual if it is so long that it cannot be fully served by a human being. However, in *People v. Byrd* (2001) 89 Cal.App.4th 1373 [108 Cal.Rptr.2d 243], we expressly disagreed with Justice Mosk's nonbinding concurrence, and we said imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel and/or unusual punishment. (*Id.* at p. 1383 [no cruel or unusual punishment in sentence of 115 years plus 444 years to life for 12 counts of robbery plus mayhem, and attempted premeditated murder, with personal discharge of firearm, and three priors].)

*People v. Sullivan* (2007) 151 Cal.App.4th 524 [59 Cal.Rptr.3d 876] (*Sullivan*), upheld against a challenge of cruel and/or unusual punishment a sentence of 210 years to life in prison for conviction of six counts of robbery, with two prior serious felony convictions and two prior prison terms. (*Id.* at pp. 568–571.) *Sullivan* said the current offenses—a series of robberies which included threatened acts of violence with a deadly weapon—"must be considered acts of a most heinous nature." (*Id.* at p. 570.) The defendant was "an incorrigible recidivist offender who presents a most grave and extreme level of danger to society." (*Ibid.*)

Defendant argues *Sullivan* is distinguishable because the defendant there committed six robberies in less than three months, while on "escape status," while claiming to have a gun, and he had an extensive history of serious felonies dating back many years plus two prior prison terms. Defendant says his own criminal history is mostly misdemeanors, and he only has one prior prison term. However, defendant here committed six current offenses threatening violence while on probation for the same type of conduct. He had enough serious felonies to trigger the three strikes law. In addition, he acknowledges a long history of misdemeanors, as follows:

In 1984 (at age 20), he was convicted of misdemeanor assault, served some jail time and was placed on probation. He had three vandalism convictions, two with resisting arrest, in 1990, 1991, and 1992. The first vandalism case, which included being drunk in public, resulted in a 30-day sentence with no probation. The second and third cases each resulted in one year of probation. Also in 1992, defendant received two years of probation for a misdemeanor assault conviction. In January 1994, he got 18 months of probation for petty theft. In July 1994, he got three months' probation for misdemeanor spousal abuse. Two months later, he was fined for marijuana possession. In January 1998, he got three years' probation for misdemeanor spousal abuse.

As to felonies, defendant acknowledges he had four prior felony convictions: (1) 1988 marijuana possession (probation); (2) 1998 spousal abuse (a felony that was supposed to be reduced to a misdemeanor on completion of probation, which he did not complete); (3) 1999 battery with serious injury

for punching someone in the face and breaking his jaw (two-year prison sentence), which serves as defendant's "first strike" in the current case; and (4) 2003 criminal threats and stalking to which he pled no contest pursuant to a plea deal and was placed on probation (defendant's "second strike" in the current case).

Defendant looks at his criminal record and says, "Thus, [defendant] at 42 years old had served only one prison term and that prison term was only two years. Thus, his record would not justify life without parole." He views the past leniency in sentencing as proof that the criminal justice system did not regard him as dangerous.

In contrast, we look at his record and see a relentless recidivist who repeatedly thumbs his nose at an overly generous criminal justice system, demonstrating that he is indeed a danger.

Defendant argues the prosecutor's pretrial offer of 25 years to life in prison with a plea to any one count (which defendant rejected) indicates the prosecutor did not believe a longer sentence was necessary for public safety. Defendant cites *Reyes v. Brown* (9th Cir. 2005) 399 F.3d 964, which remanded a case for further evidence but said in a footnote that the court's "suspicion" that the defendant's 26-year-to-life sentence under the three strikes law for perjury on a driver's license application might have been disproportionate was supported by the fact the prosecutor had offered a plea deal of four years in exchange for a guilty plea. (*Reyes*, at p. 969, fn. 9.) "By offering [the defendant] such a heavily discounted sentence, an inference may properly be raised that the State did not view [the defendant] as a 'danger to society' and that the State did not feel 'the need to counter his threat with incapacitation.' " (*Ibid.*, citing *Lockyer v. Andrade* (2003) 538 U.S. 63, 81 [155 L.Ed.2d 144, 123 S.Ct. 1166] (dis. opn. of Souter, J.).)

*Reyes* is distinguishable. The offer there was for four years, which is a relatively short period of time; the sentence was more than six times the offer; and the triggering offense involved no threat of violence. Rather, it involved the defendant filling out a driver's license application under his cousin's name in an attempt to get a license for his illiterate cousin. (*Reyes v. Brown, supra*, 399 F.3d at p. 965.) Here, the offer was for 25 years, which is a substantial period of time; defendant's sentence is only three times the offer; and the triggering offenses involved assault with a deadly weapon and terrorizing threats of violence.

The penalty is not grossly disproportionate to the gravity of the offenses. We therefore need not discuss defendant's arguments about intrastate and interstate comparisons regarding his federal claim (*Meeks, supra*, 123

Cal.App.4th at p. 707, citing *Harmelin v. Michigan, supra*, 501 U.S. at p. 1005 [115 L.Ed.2d at pp. 871–872] (conc. opn. of Kennedy, J.)), though we will discuss them regarding the broader California constitutional claim.

We conclude defendant's sentence does not violate the United States Constitution's prohibition against cruel and unusual punishment.

### B. *California Constitution*

Whereas the federal Constitution prohibits cruel "and" unusual punishment, California affords greater protection to criminal defendants by prohibiting cruel "or" unusual punishment. (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921]; *Carmony, supra*, 127 Cal.App.4th 1066, 1085.) Under the California Constitution, punishment is disproportionate if it "shocks the conscience" and offends fundamental notions of human dignity, considering the offender's history and the seriousness of his offenses. (*Lynch, supra*, 8 Cal.3d at p. 424.) We first examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. (*Carmony, supra*, 127 Cal.App.4th at p. 1085.) Relevant factors include the facts of the current crimes, the nature of the offenses, aggravating circumstances, violence, whether there are rational gradations of culpability that can be made on the basis of the injury to the victim or to society in general, and penological purposes of the prescribed punishment. (*Ibid.*) Second, we compare the penalty with penalties prescribed in California for different, more serious offenses. (*Ibid.*) Third, we compare the penalty with penalties for the same offenses in other jurisdictions. (*Ibid.*) Our authority is circumscribed by the separation of powers doctrine. (*Id.* at p. 1086.)

#### 1. *Nature of Offense/Offender*

For the reasons stated in our discussion of the federal Constitution, we conclude defendant's sentence does not shock the conscience and is not grossly disproportionate. (*Carmony, supra*, 127 Cal.App.4th at p. 1086.)

#### 2. *Intrajurisdictional Comparison*

Defendant says his sentence of 78 years to life in prison is disproportionate to the penalty for other crimes in California, such as 25 years to life for first degree murder without special circumstances (§§ 189, 190, 190.1); 15 years to life for second degree murder (§ 190, subd. (a)); life in prison with parole eligibility in seven years for torture (§§ 206, 206.1); life in prison with parole eligibility in seven years for aggravated mayhem (§§ 205, 3046); three to eight years for rape (§ 264); and three to eight years for kidnapping (§§ 207,

208). Defendant says his sentence is substantially longer than the sentence for second strike offenders who commit one of these offenses, yet it is not reasonable to conclude that defendant poses a greater risk to the public than such offenders. Defendant says his sentence is longer than the sentence for habitual sexual offenders.

However, the maximum punishment for the hypothecated first degree murder includes the death penalty, which is more severe than defendant's sentence. (§ 190; *Sullivan, supra,* 151 Cal.App.4th at p. 571.) Moreover, defendant is a third strike offender who committed multiple offenses in the current case, and thus is not comparable to second strike offenders who commit one new offense. (*Sullivan, supra,* 151 Cal.App.4th at pp. 571–572.) Nor is defendant similar to habitual sex offenders who have not threatened to kill their victims.

Defendant's sentence is not out of all proportion to the punishment in California for commission of multiple, serious stalking/assault/criminal threat offenses by a third strike offender.

### 3. *Comparison with Other States*

As to interjurisdictional analysis, "if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of [other] jurisdictions, the disparity is a further measure of its excessiveness." (*In re Lynch, supra,* 8 Cal.3d at p. 427; see *Carmony, supra,* 127 Cal.App.4th at p. 1089.)

Defendant notes 11 states have recidivist penalties that allow for sentences of life without parole (which he argues is the effect of his sentence). He cites statutes of Alabama, Delaware, Georgia, Indiana, Louisiana, Maryland, Mississippi, New Jersey, South Carolina, Virginia, and Washington.

Defendant says some states (Louisiana, Maryland, Mississippi, South Carolina, Virginia, and Washington) would not even consider his current crimes as violent felonies for purposes of recidivism laws. For example, he says his convictions for stalking and assault would not qualify as violent felonies under Louisiana's recidivism law. (La. Rev. Stat. § 14:2.) He notes the sentence there is six months for aggravated assault and one to five years for stalking where the victim is placed in fear of death or bodily injury. (La. Rev. Stat. §§ 14:37, 14:40.2.) However, in Louisiana the sentence for a *second* stalking conviction is five to 20 years. (La. Rev. Stat. § 14:40.2.) Here, the trial court found true the special allegation that defendant was subject to an enhanced sentence for stalking under section 646.9 because he was previously convicted of stalking.

In any event, the fact that defendant's current offenses might not qualify for recidivist sentencing in other states does not render the California punishment cruel or unusual. "That California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' [Citation.]" (*Martinez, supra*, 71 Cal.App.4th at p. 1516; accord, *Sullivan, supra*, 151 Cal.App.4th at p. 573.)

Defendant mentions other states (e.g., Alabama) where he might receive as long a sentence as he received here, but he contends those states would allow him to be eligible for parole in less time than California allows. Though defendant does not develop the legal point, we note a comparison of parole ineligibility may afford a basis for a finding of cruel and unusual punishment. (*In re Grant* (1976) 18 Cal.3d 1, 16 [132 Cal.Rptr. 430, 553 P.2d 590].)

However, defendant does not demonstrate that the parole eligibility in the other states applies to recidivist offenders. Rather, he cites (1) sentencing statutes for various offenses with enhancements for recidivism, and (2) general statutes regarding parole eligibility. He cites no authority of the impact of recidivist sentencing laws on the general provisions concerning parole eligibility. (E.g., Ala. Code, § 15-22-28 [persons are eligible for parole after serving lesser of 10 years or one-third of sentence, though parole board may release prisoners earlier by unanimous vote]; Del. Code, tit. 11, §§ 4346, 4217 [defendant sentenced to life in prison is eligible for parole after 15 years, and after serving half of imposed sentence is eligible for sentence modification at request of dept. of corrections for good cause].)

Defendant cites no authority that those general statutory provisions for parole eligibility apply to recidivist offenders under a type of three strikes law. Indeed, defendant acknowledges one of the states he discusses, Georgia, prohibits parole eligibility for persons convicted of a fourth felony.

We conclude defendant's sentence does not constitute cruel or unusual punishment under the California Constitution.

We conclude defendant's sentence does not constitute cruel and/or unusual punishment under the federal or state Constitution.

## DISPOSITION

The judgment is affirmed.

Hull, J., and Robie, J., concurred.

A petition for a rehearing was denied June 26, 2009, and appellant's petition for review by the Supreme Court was denied September 23, 2009, S174752. Werdegar, J., did not participate therein.