Filed 8/26/20  P. v. Ward CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| THE PEOPLE, | B295233 |
|---|---|
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA144863) |
| v. | |
| KENNETH WARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger Ito, Judge.  Modified and, as so modified, affirmed.

Law Offices of Chris R. Redburn and Chris R. Redburn for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Kenneth Ward was convicted of two counts of second-degree robbery and one count of second-degree burglary of a marijuana dispensary, as well as gang, firearm, and prior conviction enhancements. He was sentenced to an aggregate term of 76 years to life in prison, including six 1-year enhancements for prior prison terms. On appeal, he challenges his convictions and sentence on three grounds: (1) there was insufficient evidence to support his second-degree burglary conviction, and the trial court erred in instructing the jury on burglary; (2) his sentence was grossly disproportionate to his offenses, and thus cruel or unusual punishment under the state and federal Constitutions; and (3) the prior prison term enhancements must be stricken under newly enacted Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136). We agree with defendant only as to the third ground and accordingly strike the prior prison term enhancements. In all other respects, we affirm the judgment.

# II. FACTUAL AND PROCEDURAL BACKGROUND

## A. *Prosecution Evidence*

### 1. The Robberies

In 2017, the 92 Bishop Bloods and Bee Bops criminal street gangs were allies who engaged in various criminal activities together, including narcotics sales and robberies.

Defendant, who was 53 years old at the time of trial, was a member of the 92 Bishop Bloods. Defendant's cousin, Jerry Tyson, and Wayne Walker were also 92 Bishop Bloods members. Izeall Pleasant was a member of the Bee Bops gang.

O.G. Collective was a recreational marijuana dispensary in Los Angeles County. The dispensary was equipped with 16

2

security cameras, which captured footage from inside the dispensary. Upon entering the dispensary, customers had to be buzzed into a security area and provide identification, and a security guard would enter their names in a sign-in log.

Video surveillance footage from the dispensary and nearby homes showed that at approximately 10:52 a.m. on May 4, 2017, a gold van, registered to Walker's wife, stopped in an alley near the dispensary. Three men exited and headed toward the dispensary. At 10:53 a.m., a blue Monte Carlo, which was registered to defendant's daughter, pulled into the alley, waited a few minutes, and drove away.

Meanwhile, based on the video evidence and the dispensary's sign-in log, Walker walked past the Monte Carlo, briefly entered the dispensary, and left the dispensary at 10:56 a.m.

At 11:02 a.m., Pleasant and Tyson entered the dispensary and were signed in by security guard Xavier Clark. Once inside, Pleasant and Tyson displayed a firearm, ordered Clark to get on the floor, and robbed him of his gun, cellular telephone, and iPod. Store manager Brianna Perez witnessed the armed robbery and was frightened for her life. She raised her arms because she realized what was happening. The three men who arrived in the gold van entered the dispensary at 11:04 a.m. and joined Pleasant and Tyson. Perez led the three men to the money safe and opened it. The three men removed $1,300 in cash and $16,000 in marijuana from the safe. They also robbed Perez of her iPhone.

While the men were inside the dispensary, the blue Monte Carlo circled the neighborhood and drove slowly past the alley. Pleasant, Tyson, and the three men who had arrived in the gold

3

van then left the dispensary and returned to the alley. At 11:07 a.m., the Monte Carlo returned to the alley, with the passenger seat empty and folded forward. The three unidentified men entered the Monte Carlo, which then drove away. At 11:09 a.m., the gold van drove up to pick up the remaining two men, Tyson and Pleasant.

## 2. The Investigation

Clark and Perez identified Pleasant and Tyson as two of the robbers in pretrial photographic lineups.

Los Angeles County Sheriff's Deputy Bryce Chalmers interviewed defendant on May 30, 2017. Defendant admitted he was "O.G."[1] from the 92 Bishop Bloods gang. He told Chalmers that he had been driving near the dispensary with his girlfriend on the morning of May 4. He was looking for Walker in the neighborhood because he heard Walker "was involved with something." As he was searching for Walker, three acquaintances—"Little O.J.," "Man Man," and "a dude from Bee Bop with a bowl haircut"—asked him for a ride. After they entered his car, they disclosed that they had just robbed the dispensary. Defendant immediately pulled over and ordered them out of the car, explaining that he would go to prison for life if he was involved. He described the robbers as "fools" who should know better than to rob in their own neighborhood. Defendant repeatedly stated that he did not participate in the robbery and did not know about it until the men entered his car. The same day, defendant met the men at a different location and

---

[1] "O.G." refers to "original gangster" and is a term of respect in gang parlance. (See *People v. Woods* (1991) 226 Cal.App.3d 1037, 1045.)

4

admittedly accepted a jar of marijuana, because they had put him at risk by getting in his car after the robbery.

Chalmers also interviewed Pleasant, who confessed to the robbery. Pleasant said that an older man, whose name he did not know, drove him to the dispensary in a blue Monte Carlo. Then he and Tyson, armed with handguns provided by Walker, entered the dispensary and robbed the store along with the three unidentified men.

### 3. Gang Expert

A gang expert testified that, in his opinion, the crime was committed for the benefit of, at the direction of, and in association with a gang.[2] He opined that there was "[o]bvious direction as they looked coordinated," and the use of two getaway drivers was evidence the crime was "planned." Further, the expert testified that it was typical for members who participated in a drug crime to be paid with marijuana.

### B. *Defense Evidence*

Defendant's brother testified that defendant had not been a gang member for 20 or 30 years, although some of his gang tattoos were more recent.

Chalmers was re-called and testified for the defense regarding his interview with defendant. On May 4, defendant learned that Walker was "doing a job," against his advice. As defendant was driving with his girlfriend searching for Walker, "that's when [the three men] run out," and defendant first learned about the robbery. Defendant told Chalmers, "I'm not a

---

[2]     Because the sufficiency of the evidence to prove the gang enhancement is not challenged on appeal, we do not further detail it here.

5

part of them youngsters no more," and expressed he was upset that the three men jumped into his car.

### C. Verdict and Sentencing

Defendant was tried with codefendant Tyson.[3] On November 9, 2017, a jury found defendant and Tyson guilty of two counts of second-degree robbery (Pen. Code, § 211; counts 1 and 2)[4] and one count of second-degree felony burglary (§ 459; count 3). The jury found the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C) [10-year enhancement for violent felony].) The jury also found that Tyson personally used a handgun (§ 12022.53, subd. (b)) and that a principal personally used a handgun (§ 12022.53, subd. (b) & (e)(1)).

In a bifurcated proceeding on January 15, 2019, the trial court found defendant had suffered seven qualifying prior strike convictions under the Three Strikes Law (§§ 667 [25 years to life for Third-Strike offense] & 1170.12), four prior serious felony convictions (§ 667, subd. (a)(1) [five-year enhancement for prior serious felony]), and served six prior prison terms (§ 667.5, subd. (b) [one-year enhancement for prior prison term]).[5]

---

[3] During trial, codefendants Walker and Pleasant pled no contest to a count of robbery. Walker received a sentence of three years in prison. Pleasant, a second-strike offender, received a sentence of 25 years in prison.

[4] Further unspecified statutory references are to the Penal Code.

[5] Defendant's extensive criminal history is described in more detail in section III.B.2.b., *post*.

6

Defendant was sentenced to an aggregate term of 76 years to life in prison. On counts 1 and 2, the court imposed consecutive terms of 38 years to life for each count, consisting of a life term for defendant's prior strike convictions under the Three Strikes Law, the high term of five years on the robbery conviction due to defendant's criminal history, plus a 10-year gang enhancement, a 20-year enhancement for four prior serious felony convictions, and three 1-year enhancements for his three prior prison terms. On count 3, the court imposed a concurrent term of 25 years to life because the burglary and the robberies were part of one transaction.

Defendant filed a notice of appeal.

## III.    LEGAL DISCUSSION

### A.    *Substantial Evidence Supports Defendant's Second-Degree Burglary Conviction, and The Trial Court Did Not Err in Instructing the Jury on Burglary.*

Defendant contends his second-degree burglary conviction was not supported by substantial evidence because his involvement was limited and occurred only after the burglary was already completed. For the same reasons, defendant contends that the trial court erred in instructing the jury on second-degree burglary. We disagree.

#### 1.    Substantial Evidence Supports the Burglary Conviction.

##### a.    *Legal Principles*

In reviewing a conviction challenged for insufficient evidence, we review the whole record " ' "to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable

7

doubt." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 396.) " ' "On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) The test is not whether the evidence establishes guilt beyond a reasonable doubt but whether the evidence could persuade a reasonable jury to find guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) " ' "[I]t is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends," ' " and if the verdict is supported by substantial evidence, we accord due deference to the trier of fact. (*Smith*, at p. 739.)

Burglary is defined as the entering of a building with the intent to commit a larceny or a felony. (§ 459.) A defendant accused of a burglary may be guilty as a direct perpetrator of the crime or as someone who aids and abets in its commission. (§§ 30, 31.) " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Delgado* (2013) 56 Cal.4th 480, 486.) " 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) "The 'act' required for aiding and abetting liability need not be a substantial factor in the offense." (*People v. Swanson–Birabent*

(2003) 114 Cal.App.4th 733, 743 (*Swanson-Birabent*).)  Thus, lookouts, getaway drivers, and persons present to divert suspicion are principals in the crime.  (*Id.* at pp. 743–744.)

### b. *Analysis*

Reviewing the evidence in the light most favorable to the judgment, we conclude that substantial evidence supports defendant's burglary conviction.  Defendant's primary argument is that because a burglary is completed upon entering a building (see § 459), the burglary was completed when Tyson and Pleasant entered the dispensary at 11:02 a.m., and "the mere presence of his car in the neighborhood"[6] before that time is insufficient evidence that he aided and abetted the burglary.  But defendant's representation of the record is inaccurate.  The People relied largely on circumstantial evidence to establish defendant's connection to the crime, but nevertheless it was sufficient to prove his guilt beyond a reasonable doubt. (See *People v. Bollaert* (2016) 248 Cal.App.4th 699, 708.)  The videos established not only defendant's presence at the scene, but his obvious orchestration with the six other men before and after the burglary.  Defendant's distinctive car, a blue Monte Carlo, was near the dispensary before the burglary, and indeed, Pleasant confessed to the crime and stated he arrived at the dispensary in

---

[6]     Defendant contradicts himself by arguing in the same paragraph that his "car was not proven to be in the neighborhood until after the crime was completed."  It seems undisputed that the blue Monte Carlo was in the neighborhood before the burglary.  As captured on video, the blue Monte Carlo pulled into the alley by the dispensary around 10:53 a.m.  During the investigation, Pleasant also stated that he was driven to the dispensary in a blue Monte Carlo.

9

a blue Monte Carlo. The Monte Carlo circled the neighborhood while the men were inside the dispensary, and the same three men who had gotten out of Walker's van prior to the burglary waited in the alley after the burglary, until the Monte Carlo arrived at this designated pickup location. Despite defendant's claim that he was driving with his girlfriend searching for Walker when he encountered the three men, the video showed that Walker walked in plain sight of the Monte Carlo on his way to the dispensary, and the passenger seat of the Monte Carlo was empty when it arrived to pick up the men. Based on this evidence of defendant's presence at the scene at the exact time of the burglary, and the Monte Carlo's movements before and after the burglary, the jury reasonably concluded that defendant knowingly assisted in the burglary from the beginning, and was not merely an accidental participant after its completion.

Defendant emphasizes the absence of any substantial evidence that he planned the burglary along with the six other men. But based on the evidence we have discussed, a jury could reasonably conclude that defendant, his codefendants, and the three unidentified men worked in coordination with each other, each person fulfilling a different, pre-assigned role: Walker staked out the dispensary, Tyson and Pleasant took control of the security guard, the three unidentified men took possession of the property, and defendant and Walker served as lookouts and getaway drivers. As a lookout and getaway driver, defendant was a principal in the burglary. (See *Swanson-Birabent*, *supra*, 114 Cal.App.4th at pp. 743–744.) The jury discredited defendant's version of the facts that he encountered the three men by coincidence as he was driving and searching for Walker, and that he disengaged himself from the burglary as soon as he

10

learned about it—a version that is inconsistent with defendant's own admission that he later met the three men to accept part of the stolen marijuana. We note " 'it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Jones* (2013) 57 Cal.4th 899.) If the circumstances reasonably justify the jury's fact findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*Ibid*.) Finding the circumstances reasonably justified the jury's findings, we conclude that substantial evidence supports the conviction for second-degree burglary.

**2. The Court Did Not Err by Instructing the Jury on Burglary.**

For the same reasons we find there was substantial evidence to support the burglary verdict, we conclude the trial court did not err in instructing the jury on second-degree burglary based on its determination that substantial evidence supported the instruction.

A jury instruction is warranted if it is supported by substantial evidence. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823; see *People v. Edwards* (1985) 39 Cal.3d 107, 116 [court's refusal to provide requested instruction of charged offense, where substantial evidence would warrant a conviction, is reversible error].) The test is whether there is evidence that deserves consideration by the jury—that is, evidence from which a reasonable jury could conclude that the specific facts supporting the instruction existed. (*Larsen*, at p. 824.)

As we have discussed, substantial evidence supports the burglary conviction. On that basis, it also supports the burglary instruction.

11

***B.*** ***Defendant's Cruel or Unusual Punishment Claim Is***
***Forfeited and Also Fails on the Merits.***

Defendant argues his sentence of 76 years to life is "grossly disproportionate" to his offenses and violates the state and federal Constitutions. The People contend, and we agree, that defendant has forfeited this claim, which also fails on the merits.

**1. Defendant's Claim Is Forfeited.**

Defendant has forfeited the argument that his sentence was a cruel or unusual punishment because he failed to raise an objection on this ground below. Defendant argues that errors of constitutional dimension "affecting substantial rights" are "never waived." However, the general rule that a failure to object to errors in the trial court forfeits consideration of the issue on appeal "applies to . . . claims based on violations of fundamental constitutional rights." (*In re Seaton* (2004) 34 Cal.4th 193, 197– 198; see § 1259.) The forfeiture doctrine specifically applies in the context of sentencing (*In re Sheena K.* (2007) 40 Cal.4th 875, 881), and "[a] defendant's failure to contemporaneously object that his sentence constitutes cruel and unusual punishment forfeits the claim on appellate review." (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247; see, e.g., *People v. Baker* (2018) 20 Cal.App.5th 711, 720; *People v. Russell* (2010) 187 Cal.App.4th 981, 992–993; *People v. Kelley* (1997) 52 Cal.App.4th 568, 583.) On that basis alone, we can, and do, reject defendant's claim.

**2. Defendant's Sentence Is Not Cruel or Unusual**
**Punishment in Light of His Current Offenses and**
**Criminal History.**

Nevertheless, we also consider and reject defendant's claim on the merits. Defendant claims that his sentence of 76 years to life was a cruel or unusual punishment under the state and

12

federal Constitutions.  He relies on several overlapping arguments: (1) the sentence imposed was grossly disproportionate to the "nonviolent," "unsophisticated," and "minor" nature of his offenses; (2) his criminal history alone does not justify a life sentence for his current offenses; (3) there is no reasonable relationship between the punishment imposed for his prior and subsequent offenses as required by *In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*), which "condemns precisely the effect of the [T]hree [S]trikes law" as applied here; (4) his "exceptionally harsh punishment" will consume the rest of his life; (5) his sentence unconstitutionally exceeded that of his codefendants Walker and Pleasant; and (6) his sentence was disproportionately severe relative to other more serious offenses under California law.  We address and reject each of these arguments in turn.

### a.    *Legal Principles*

Reviewing courts must " ' "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes," ' " as well as to the discretion that trial courts possess in sentencing convicted criminals.  (*People v. Edwards* (2019) 34 Cal.App.5th 183, 190–191, citing *Solem v. Helm* (1983) 463 U.S. 277, 290 (*Solem*).)  " 'Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive.  [Citation.]' " (*People v. Meneses* (2011) 193 Cal.App.4th 1087, 1093 (*Meneses*).)

Nevertheless, a sentence may violate the proscription against "cruel or unusual punishment" under the California Constitution " 'if it is so disproportionate to the crime for which it is imposed that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Bernal* (2019) 42

13

Cal.App.5th 1160, 1172 (*Bernal*); see Cal. Const., art. I, § 17.) Similarly, under the federal Constitution, a punishment may violate the Eighth Amendment's prohibition against "cruel and unusual punishment" if it is " ' "grossly out of proportion to the severity of the crime." ' " (*Meneses*, *supra*, 193 Cal.App.4th at p. 1092; see U.S. Const., 8th Amend.) " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*People v. Sullivan* (2001) 151 Cal.App.4th 524, 569 (*Sullivan*).)

"The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." (*Lockyer v. Andrade* (2003) 538 U.S. 63, 77; see *Meneses*, *supra*, 193 Cal.App.4th at p. 1092 [Eighth Amendment contains " ' "narrow proportionality principle" ' " that applies to noncapital cases].) In *Lynch*, our Supreme Court articulated three relevant factors in evaluating the disproportionality of the crime to the offense: (1) consideration of the nature of the offender and the offense; (2) comparison of the punishment with the penalty for more serious crimes in the same jurisdiction; and (3) comparison of the punishment to the penalty for the same offense in different jurisdictions. (*Lynch*, *supra*, 8 Cal.3d at pp. 425–427.) Federal courts have used a similar three-pronged approach, considering as a first factor "the gravity of the offense and the harshness of the penalty" (*Solem*, *supra*, 463 U.S. at p. 292), including the defendant's criminal history and the state's legitimate "public-safety interest in incapacitating and deterring recidivist felons" (*Ewing v. California* (2003) 538 U.S. 11, 28–29 (*Ewing*). It is only in the "rare case" in which the first factor results in an inference of gross disproportionality that a court will consider the last two

14

factors. (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1088 (*Haller*); *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001, 1004–1005 (conc. opn. of Kennedy, J.).)

### b. Analysis

We reject defendant's contention that, under state and federal standards defining cruel or unusual punishment, defendant's sentence is grossly disproportionate to his offense. We begin by analyzing the first factor in the *Lynch* analysis, the nature of the offender and the offense. (*Lynch*, *supra*, 8 Cal.3d at p. 425.) We consider the offender's personal characteristics such as his age, prior criminality, and state of mind, and the circumstances of the particular crime, such as the defendant's motive, the manner in which the crime was committed, the extent of his involvement, and the consequences of his acts. (*People v. Boyce* (2014) 59 Cal.4th 672, 718–719.)

First, we address the gravity of defendant's offense, which he alleges was "nonviolent" and "unsophisticated," and thus disproportionate to his punishment. Defendant was convicted of three serious and violent felonies: two armed robberies and a burglary committed at the direction of, in association with, and for the benefit of a criminal street gang. (See §§ 667.5, subd. (c), 1192.7, subd. (c).) As we have discussed, substantial evidence supported the conclusion that defendant, along with six other men, executed the planned, coordinated robbery of two victims at gunpoint, and the theft of cash and drugs worth $17,300 from a commercial building. These offenses cannot be deemed "nonviolent" or "unsophisticated," and clearly posed a grave risk of harm to society. The jury necessarily discredited defendant's claim that his role as the getaway driver was "minor" and his involvement in the crime unknowing. Instead, the jury found

15

him guilty of knowingly assisting in the felonious taking of property from victims by force or fear and against their will. (See § 211; *Sullivan*, *supra*, 151 Cal.App.4th at p. 570 [no cruel or unusual punishment where robberies involved "threatened acts of violence with a deadly weapon"].)

Next, we consider defendant's lengthy criminal history, which he argues is, unjustifiably, the sole basis for his harsh punishment. However, defendant was a Third-Strike offender, and his sentence was based on both his criminal history and the serious and violent nature of his current offenses. (See § 667, subds. (b)–(i).) A defendant's criminal history informs our understanding of the nature of the offender and the offense, and recidivism "has long been recognized as a legitimate basis for increased punishment." (*Ewing*, *supra*, 538 U.S. at pp. 25, 28–29 [in weighing gravity of offense, "we must place on the scales not only his current felony, but also his long history of felony recidivism"]; *In re Coley* (2012) 55 Cal.4th 524, 562 [in determining gravity of offense, "we must consider not only petitioner's triggering offense but also the nature and extent of petitioner's criminal history"].) "In imposing a three strikes sentence, the State's interest is not merely punishing the offense of conviction," but also " 'in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society . . . .' " (*Ewing*, *supra*, 538 U.S. at p. 29.)

In view of defendant's numerous prior convictions, including violent felonies against persons, we see nothing excessively disproportionate about his sentence. For over 30 years, defendant has been in and out of prison in a revolving-door string of offenses. In 1987, defendant was convicted of attempted

16

murder and robbery and sentenced to 17 years in prison. In a separate case that year, he was convicted of two counts of robbery and sentenced to nine years in prison. In a third case that year, he was convicted of multiple counts of robbery and false imprisonment, and sentenced to six years in prison. Sometime after 2003, he was convicted of drug possession and sentenced to four years in prison. In 2007, 2008, and 2009, he was convicted of several counts of drug possession and driving with a suspended license, and sentenced to probation and prison. In 2012, defendant was convicted of multiple counts of burglary, petty theft, and shoplifting, and sentenced to three years in prison. In 2015, he was convicted of drug possession and placed on three years of probation. In 2017, while on probation, he committed the robberies and burglary that are the subject of this appeal.

Defendant has demonstrated a refusal to be rehabilitated despite numerous experiences with probation and incarceration. A person who repeats an offense, undeterred by prior convictions and incarceration, poses a serious danger to society that justifies "imposing an extremely long prison sentence—even a life term—and even when the [triggering] offenses are nonviolent." (*Bernal*, *supra*, 42 Cal.App.5th at pp. 1172–1173 [Three Strikes sentence of 85 years to life for residential burglary and assault with a deadly weapon not grossly disproportionate, in light of "history of serious or violent convictions"]; see *Rummel v. Estelle* (1980) 445 U.S. 263, 265–266, 284–285 [life sentence for fraudulent use of a credit card, with two prior felony convictions for forging a check and obtaining money by false pretenses, not cruel and unusual punishment].) Defendant has failed to lead a law-abiding life for any extended period during the 30 years that he has been in the criminal justice system. His record indicates that each time he

17

was released from prison, he committed new crimes that resulted in new prison terms or probation, with no apparent deterrent effect. Thus, this is not "the rare case" in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. (See *Haller*, *supra*, 174 Cal.App.4th at p. 1088.)

Defendant relies on *Solem v. Helm* (1983) 463 U.S. 277 and *In re Rodriguez* (1975) 14 Cal.3d 639 (*Rodriguez*), which found the offenders' criminal histories insufficient to justify the harsh sentences, but those cases are distinguishable. In *Solem*, the defendant's prior offenses consisted of "minor," nonviolent, property-related felonies. (*Solem*, at pp. 279–280, 297.) The *Solem* court found the defendant's sentence of life in prison for writing a fraudulent $100 check unconstitutional. (*Id.* at pp. 296–297.) In contrast, defendant's current offenses and criminal history involve violent crimes that far exceed *Solem* in gravity. In *Rodriguez*, the appellate court acknowledged that the petitioner's crime of lewd conduct with a child was "by no means 'trivial,' " but explained that its commission involved no violence or weapon and caused no physical harm to the victim. (*Rodriguez*, at pp. 654–655.) Significantly, both cases were decided before the 1994 enactment of the Three Strikes Law, and neither case considered whether a sentence under that sentencing scheme was unconstitutional. (See § 667, subds. (b)–(i), added by Stats. 1994, ch. 12, §§ 1–2; § 1170.12.) Therefore, neither *Solem* nor *Rodriguez* is instructive.

In addition, defendant challenges the punitive effect of the Three Strikes Law as applied here, citing *Lynch* for the proposition that "there must be a reasonable relationship between punishment for the first and subsequent offenses." But

18

in *Lynch*, the court granted the petitioner relief due to the disproportionality that resulted from "the enormous single leap from an ordinary misdemeanor [indecent exposure] to a life-maximum felony" on the second offense. (*Lynch*, *supra*, 8 Cal.3d at pp. 434–437.) In contrast, defendant suffered multiple prior felony convictions, including convictions of the same felonies with which he was charged and convicted in this case. Accordingly, defendant's "triggering criminal conduct bore both a rational and substantial relationship to the antirecidivist purposes of the Three Strikes law" and may be indicative of "future dangerousness." (*In re Coley*, *supra*, 55 Cal.4th at pp. 531, 561–562.) Thus, a more punitive prison term may be imposed under the Three Strikes Law without running afoul of the prohibition against cruel or unusual punishment based on defendant's long-standing history of repeat offenses, both violent and nonviolent. (*People v. Meeks* (2004) 123 Cal.App.4th 695, 700, 706–709 [Three Strikes sentence of 25 years to life for failure to register as a sex offender not "grossly disproportionate" in light of four prior strike convictions and "history of repeated violations" spanning 30 years]; *Ewing*, *supra*, 538 U.S. at pp. 18–21 [Three Strikes sentence of 25 years to life for felony theft of golf clubs, with prior felony convictions for a robbery and three burglaries, not cruel and unusual punishment].)

Our conclusion is not altered by defendant's contention that his punishment is cruel or unusual because it is the functional equivalent of a life sentence in prison. (See *People v. Ayon* (1996) 46 Cal.App.4th 385, 399–401.) That a sentence exceeds a defendant's life expectancy does not necessarily render it constitutionally cruel or unusual. (*People v. Byrd* (2001*)* 89 Cal.App.4th 1373, 1383.) "[I]t is immaterial that defendant

19

cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*Ibid*.)

In addition, we find no merit in defendant's argument that his sentence is unconstitutional because it is more severe than that of his codefendants Walker and Pleasant. Defendant's criminal history was sizable in comparison to his codefendants, and both Walker and Pleasant pled no contest to a single count of robbery. Walker had no prior strike convictions and was sentenced to three years in prison, while Pleasant, a second-strike offender, was sentenced to 25 years in prison. Considering defendant's status as a Third-Strike offender and his criminal history spanning three decades, defendant's sentence of 76 years to life for his conviction on two counts of robbery and one count of burglary is not unconstitutionally disproportionate to the sentences imposed on his codefendants.

Lastly, defendant urges that his sentence is grossly disproportionate when compared to more serious offenses such as murder and sex crimes under California law. Having determined that no inference of gross disproportionality arises from an examination of the nature of the offender and the offense, we need not undertake an intrajurisdictional comparison of punishments, the second factor in the *Lynch* analysis. (*Haller*, *supra*, 174 Cal.App.4th at p. 1088; see *Lynch*, *supra*, 8 Cal.3d at p. 426.) Regardless, such comparisons are inappropriate in the context of defendant's Three Strikes sentence because they ignore

20

his recidivism, which is a legitimate basis for his life sentence. (See *People v. Ingram* (1995) 40 Cal.App.4th 1397, 1415–1416.) Given defendant's continued commission of criminal offenses, his failure to be rehabilitated, the serious nature of the current offenses, and his lengthy criminal history involving some of the same crimes as his current convictions, his sentence does not shock our conscience or seem grossly disproportionate. We therefore conclude that defendant's punishment was not cruel or unusual under either the state or federal Constitutions.

## C.    *Defendant's Prior Prison Term Enhancements Must Be Stricken Under Senate Bill 136.*

Defendant contends that following the enactment of Senate Bill 136, which applies retroactively, the six prior prison term enhancements imposed on counts 1 and 2 must be stricken because his prior prison term convictions no longer qualify as predicate offenses under section 667.5, subdivision (b). The People agree.

At the time of defendant's sentencing, former section 667.5, subdivision (b), required trial courts to impose a one-year enhancement for each true finding that the defendant had served a prior prison term, unless the defendant had remained free of felony convictions and prison or jail custody for five years since the prior prison term. While this appeal was pending, Senate Bill 136 became effective on January 1, 2020. Following the enactment of Senate Bill 136, only prior prison terms for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b), are subject to the one-year enhancement under section 667.5, subdivision (b). (Stats. 2019, ch. 590, § 1.)

21

"By eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 (2019–2020 Reg. Sess.) to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682 (*Jennings*).) Therefore, under the rule in *In re Estrada* (1965) 63 Cal.2d 740, "Senate Bill No. 136's amendment to section 667.5, subdivision (b) applies retroactively to all cases not yet final as of its January 1, 2020, effective date." (*Jennings*, at p. 682.)

Defendant's case was not yet final as of January 1, 2020, and his prior prison terms were not for sexually violent offenses as defined by Welfare and Institutions Code, section 6600. Thus, defendant is entitled to the ameliorative benefit of Senate Bill 136's amendment to section 667.5, subdivision (b). Accordingly, we shall reverse the six prior prison term enhancements imposed on counts 1 and 2. (*See Jennings*, *supra*, 42 Cal.App.5th at p. 682.)

Defendant urges us to strike the enhancements, whereas the People ask that we remand the matter for resentencing so the trial court can "reconsider all of its sentencing options." But because the trial court imposed the maximum possible sentence, there is no need for the court to again exercise its sentencing discretion. (See *People v. Lopez* (2019) 42 Cal.App.5th 337, 342 [no need for court to "again exercise its sentencing discretion" under Senate Bill 136 because maximum sentence was imposed]; *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.) Therefore, we will strike the six prior prison term enhancements imposed on counts 1 and 2 without remand for resentencing.

## IV.   DISPOSITION

The six 1-year prior prison term enhancements, imposed pursuant to section 667.5, subdivision (b), on counts 1 and 2, are stricken.  The clerk of the superior court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

DHANIDINA, J.

23