Filed 11/12/24  P. v. Sedano CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL WILLIAM SEDANO,<br><br>    Defendant and Appellant. | F087376<br><br>(Super. Ct. No. F19902007)<br><br>**OPINION** |

---

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Poochigian, Acting P. J., Detjen, J. and Snauffer, J.

In 2019, defendant Daniel William Sedano was charged with continuous sexual abuse of a child (Pen. Code,[1] § 288.5, subd. (a) [count 1]), oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b) [count 2]), sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd (a) [count 3]), and forcible rape (§ 261, subd. (a)(2) [count 4]).  A jury found him not guilty as to count 1 and guilty as to the remaining counts.  Defendant received an aggregate sentence of 46 years to life:  the middle term of six years on count 4, a consecutive 25 years to life on count 3, and a consecutive 15 years to life on count 2.

In an opinion filed February 21, 2023, this court reversed defendant's conviction on count 2 and remanded the matter to the trial court to give the prosecution an opportunity to retry the count.  (*People v. Sedano* (2023) 88 Cal.App.5th 474, 485 (*Sedano*).)[2]  On remand, per the prosecution's request, the trial court dismissed count 2.  At a December 12, 2023 resentencing hearing, the court imposed the lower term of three years on count 4 and a consecutive 25 years to life on count 3.

On appeal, defendant contends the "indeterminate sentence as applied to him violates both the Eighth Amendment as well as article I, section 17 of the California Constitution."  (Boldface & some capitalization omitted.)  He also contends he is entitled to additional custody credits.  We conclude the 25-years-to-life sentence on count 3 does not constitute cruel and/or unusual punishment and accept the Attorney General's concession defendant is entitled to additional custody credits.

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2] We take judicial notice of this partially published opinion.  (Evid. Code, § 451, subd. (a).)

## STATEMENT OF FACTS[3]

Jane Doe[4] was born in May 1999 and adopted when she was four years old. Defendant is Jane's uncle, the brother of her adoptive father, and has known her since her adoption. Defendant is 37 years older than Jane. According to Jane, who was 21 years old at the time of trial, she and defendant engaged in numerous sexual activities when she was between the ages of five and 18. (*Sedano*, *supra*, 88 Cal.App.5th at p. 477, fn. omitted.)

### I. Testimony of Jane Doe

#### a. *Background*

Jane testified she "felt like [she] didn't belong in [her] family." Her adoptive mother "never really took [her] out of the house or done fun stuff with [her] or anything," "never really listened to [her] or opened up about anything to [her]," and "took a whole bunch of [her] life and just ruined it." Jane "was never really allowed to go anywhere" and "didn't have a lot of friends growing up." On the other hand, when she was with defendant, whom she visited every other weekend, she was "in [her] own little world" and "happy to be alive."

---

[3] In our prior opinion, we did not detail the facts underlying defendant's charges because they were "not germane to the issues on appeal." (*Sedano*, *supra*, 88 Cal.App.5th at p. 477.) In an order filed October 3, 2024, we informed the parties we were considering taking judicial notice of the appellate record filed in *Sedano* (case No. F082933), gave them 15 days to submit supplemental letter briefs pursuant to Government Code section 68081, and advised "this court will consider the lack of a response as indicating the party does not oppose judicial notice." Neither party filed a letter brief. On our own motion, we take judicial notice of the appellate record filed in *Sedano* (case No. F082933), from which we obtain the facts set forth in parts I and II of this section. (See *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 426, fn. 1; see also Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

[4] We refer to the victim by a pseudonym to protect her privacy. (Cal. Rules of Court, rule 8.90(b)(4); see *Sedano*, *supra*, 88 Cal.App.5th at p. 477, fn. 3.)

b. *Count 3*

When Jane was 10 years old, defendant sat her down in the living room, removed his clothes and her pants, and touched her "everywhere inappropriately." Defendant inserted two fingers into her vagina and grabbed her buttocks. He then put on a condom and inserted his penis into her vagina. Jane screamed because the intercourse "hurt a lot." Afterward, defendant told her "not to tell anybody" and "pretended like it was nothing."

c. *Count 4*

When Jane was 18 years old, defendant bought her tickets to a concert in Los Angeles. On the day of the concert, they traveled together to Los Angeles, and defendant booked a hotel room for them. That night, defendant and Jane used a rideshare to get to the venue. Jane attended the concert while defendant "went on his own" to drink beer. Afterward, they used the rideshare to return to the hotel. In the room, Jane was on one of the beds watching television when defendant "went on top of [her]," "rubb[ed] everywhere on [her] body," and "took off [her] clothes." He then "took off his pants" and pinned her by the wrists. Jane repeatedly screamed, "Please, don't do this." Defendant ignored her, put on a condom, and raped her for about seven minutes. Thereafter, he warned her "not to tell" and fell asleep. Jane "went in the bathroom and cried" for "a good hour."

d. *K.F.* [5]

Sometime before the Los Angeles concert, defendant introduced Jane to K.F., a female around her age whom defendant was dating. The trio went to a hotel in Fresno, where defendant wanted the girls "to kiss," "to be in the bath together," and "to do a whole bunch [of] inappropriate stuff together with him." Jane and K.F. were "scared"

---

[5] We refer to this individual by her initials to protect her privacy. (Cal. Rules of Court, rule 8.90(b)(10).)

4.

and "didn't want to be in there," but they kissed because they "had to."  Defendant then ordered them to "suck his penis" and "jack him off."  When Jane whispered to K.F. that she "didn't want to do it," K.F. replied, "It's okay, I'll do it."  Jane went to the bathroom and cried as K.F. "jerked [defendant] off."  At some point, defendant "got really mad at [K.F.]" and "threw stuff off the dresser."  Later, at defendant's behest, Jane and K.F. took off their clothes and stepped in the bathtub.  Defendant remarked, "Oh, you guys look beautiful."

e. *Aftermath*

Jane testified defendant "took love away and her virginity" and she "can't ever be happy again."  She cannot listen to certain songs or watch certain television shows because they remind her of the traumatic events.

## II.  Testimony of K.F.

K.F., who was 20 years old at the time of trial, met defendant online when she was 17 years old.  They started dating before she found out he was already married.  During their one-and-a-half-year relationship, K.F. and defendant had sex less than five times.  Each of those occasions occurred when she was 18 years old.

K.F. remembered at least two conversations with defendant about his niece Jane.  According to defendant, he started touching Jane when she was seven years old:  they "were in the pool," she was "always coming on to him," and he "couldn't help himself."  Another time, when defendant was babysitting Jane, he would "have her on top of him" and they would "grind[] or hump[]."  Eventually, defendant would "giv[e] [Jane] oral," which he was "into" and she "liked."  Defendant and Jane engaged in unprotected sex when the latter was 12 or 13 years old.  He "would track her period so they wouldn't have to use condoms."

Defendant introduced K.F. to Jane, saying they could "be good friends" since they "were really similar personality-wise."  The three checked into a hotel in Fresno and then went shopping.  Defendant purchased marijuana and K.F. and Jane "smok[ed] weed that

5.

whole day." Later that night, back at the hotel, K.F. and Jane were on a bed when K.F. was fondled by defendant. K.F. was "really uncomfortable" because defendant was "doing this in front of [his] niece." Jane "seemed numb" and unsurprised by this behavior. Defendant eventually stopped. The following day, however, he was aggressive, "touch[ing] [the girls'] legs" and repeatedly telling them to "kiss and stuff." K.F. and Jane "kissed once" "briefly," but defendant "wanted more." When the girls expressed reluctance, he threw his "good-size vape" at the wall. K.F. "freaked out" and "had a panic attack." As she was hyperventilating and crying, Jane comforted her and said, "Let me calm him down." Jane went over to defendant, who was on his bed. He "gripp[ed] her" tightly, "rubb[ed] her" in a sexual manner, and made several comments (e.g., "You guys are so pretty, you're hot"; "It's okay to, like, do this"; "Put your hand there"). Defendant removed his pants and "forcefully guid[ed]" Jane's hand "down there." K.F., who had calmed down and "didn't want [Jane] to go through more sexual abuse," "went over there" and "did basically what [defendant] wanted [her] to do with [her] hands." K.F. told Jane, "You don't need to do this . . . . If this is what it takes . . . for us to get home safe and everything to be fine, I'll do it. Like, you don't have to do anything. Because . . . you've been through enough." Defendant gripped K.F.'s hands tightly and used them to stimulate his penis.

At the time of the incident, K.F. recalled Jane "reminded [her] of . . . a five-year old in her demeanor." Although Jane was older, she "was very bubbly, easygoing, way more na[ï]ve than a 19-year old should be"; "super numb to everything that was going on"; and "a really big people-pleaser," "[v]ery compliant" and willing to "do whatever you wanted."

## DISCUSSION

Defendant presents two arguments on appeal. First, "given the nature of the offense and [defendant]'s personal characteristics, a life sentence in this case amounts to cruel or unusual punishment under [a]rticle I, section 17 of the California Constitution as

well as cruel and unusual punishment under the Eighth Amendment of the federal Constitution." Second, "[defendant]'s presentence custody award was miscalculated to his detriment."

## I. Defendant's indeterminate sentence on count 3 does not constitute cruel and/or unusual punishment.

### a. *Background*

#### i. Initial sentencing hearing

At a June 11, 2021 sentencing hearing, defense counsel argued a life sentence for defendant—who was born in 1962 and 58 years old at the time of said hearing—"could be characterized as a cruel and unusual or cruel or unusual." She noted defendant "serve[d] this country for 20 years in the Air Force" and was suffering from posttraumatic stress disorder.

The prosecution disagreed, arguing the egregious nature of defendant's conduct. Among other things, the prosecution emphasized: (1) Jane was a "vulnerable victim"; (2) defendant, who was Jane's uncle, "preyed on her" "instead of being a supportive uncle to her"; (3) he "physically t[ook] away [her] virginity"; (4) he "had groomed her to the point where she just blindly followed him"; (5) he "continued to take advantage of her" "into her adult life"; and (6) he "mentally scarred her for life." The prosecution also pointed out that defendant "has never been remorseful."[6]

In addition, Jane Doe testified:

> "Your Honor, um, so I've had a very traumatic life growing up. I was dealing with a lot of emotions. Um, by the age of four, I didn't know how to walk or talk. Um, I was pretty messed up. Um, so, I guess it's getting a lot better now that I'm growing up. And this whole court thing has really realized – well, let me realize that I was dealing with a lot more emotions than I ever was before. Um, some emotions, I would wake up every day –

---

[6] The prosecution referred to a letter written by defendant and filed with the trial court on April 22, 2021, several months after the verdict was rendered. In it, defendant maintained his innocence, asserting he was "convicted on perjured testimony."

7.

well, most of the time happy.  But then sometimes I would wake up depressed, and not knowing what to do.  And rethinking my past and I just – I want to be able to get better, I want to be able to experience – I'm 22 now.  I want to be able to experience what a young adult experiences, I want to – I've never had the child life that I would ever have.  My mom never really let me go out with my friends, go do stuff.  Um, it's just – it was just hard.  And it's just sad. . . ."

Thereafter, the trial court pronounced:

"Mr. Sedano, what happened here, I have no doubt occurred as the way it's testified.  I say that because the evidence was corroborated by [K.F.].  You don't have to look at me and that's fine.  And you can look away and that's fine too.  I served in the Air Force many years.  I was active duty.  And, in fact, I was both enlisted and an officer.  This is really unbecoming, frankly.  I'm mindful of the fact that you have former military service and I'm going to credit you as a mitigating circumstance that you're suffering from [posttraumatic stress disorder].  But that only goes so far in this case.

". . . With regards to the imposition of punishment and the Eighth Amendment and the [a]rticle I, [s]ection 17 of the California Constitution's cruel or unusual punishment provision, I address in this way:  A sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment only if it's so grossly disproportionate to a crime for which it inflicts and it shocks the consci[ence] and offends fundamental emotions of human dignity.  This is according to our U.S. Supreme Court.  In *Solem v. Helm* (1983) 463 U.S. 277 (*Solem*), the Supreme Court set forth guidelines or factors to consider whether a sentence i[s] disproportionate to a crime to include the nature of the offense, and the offender, to a comparison of the challenged penalty with the punishment prescribed for other more serious crimes, and three, comparison of the challenged penalty with punishment prescribed for the same offense in other jurisdictions. . . .  The U.S. Supreme Court readdressed the Eighth Amendment in *Harmelin v. Michigan* (1991) 501 U.S. 957 (*Harmelin*) and offered a historical analysis of the Eighth Amendment. . . .  [T]he Court questioned the principle o[f] proportionality under the three-factor test of *Solem* and noted the length of sentence is purely a matter of legislative prerogative for the offenses and incapacitation of removing the offender from society for significant periods of time.  A majority in *Harmelin*, however, found common principles in a cruel and unusual analysis are, one, setting prison terms involves substantive and penological judgments within the province of the Legislature . . . , such that the Court must give substantial deference.  Two, different criminal justice systems may give different weight and different times to the goals of retribution, deterrence, incapacitation and

8.

rehabilitation. Three, marked divergencies in sentencing lengths is inevitable and often a beneficial result of our system of courts such that a state with a more severe punishment for a particular crime does not alone render it grossly disproportionate. And, four, proportionality review should be objective and should rely on objective factors to the extent possible, but noting . . . Courts lack clear objective standards to distinguish between the sentences for different terms of years. Basically, what it's saying is that the Court might not be in the best position and must defer to the Legislature and/or setting of penalties for certain offenses.

". . . Defendant's convictions here, even when sentenced consecutively, are not cruel and unusual under the Eighth Amendment this Court finds. The Court grants deference as it must to the Legislature in setting the penalty for these offenses. This Court recognizes that Defendant's aggregate sentence would be very severe, but the Court must look at the gravity of . . . Defendant's conduct. The offenses were committed against a minor child ten years old or younger, society's most vulnerable victims. The [L]egislature can probably determine that children are uniquely susceptible to outrage and exploitation. Hence, special laws are enacted by our Legislature. This Court easily accepts the Legislature's determination that sex crimes against children . . . 10 years and younger are very grave offenses that warrant severe punishment. So, in view of *Harmelin*, the Court rejects the claim that this punishment is grossly disproportionate because it treats him more severely than any other criminals who commit serious crimes. In this Court's opinion, this is not a rare case that gives rise to an inference of consecutive terms creating a gross disproportionate term itself. Nor does this term violate the . . . California [c]onstitutional ban on punishments for the same reasons, essentially. Here, this does not shock the consci[ence] or offend fundamental emotions of human dignity. It was for our Legislature to make the decision about the types of penalties to be imposed for certain types of offenses and these are very grave offenses indeed. So, accordingly, after review of the California Constitution and its jurisprudence pertaining to [a]rticle I, [s]ection 17, the Court denies the motion as cruel or unusual under the California Constitution, likewise.[7]"

The court also found defendant "took advantage of a position of trust or confidence to commit the offenses here."

---

**7** Any case citation in the quoted text was reformatted to conform to the general rules of citation outlined by the California Style Manual. (See generally Cal. Style Manual (4th ed. 2000).)

ii. Resentencing hearing

At the December 12, 2023 resentencing hearing, defense counsel asserted defendant's age militated against an indeterminate term because he was statistically unlikely to serve the minimum 20 years required to become eligible for consideration under the Elderly Parole Program. (See § 3055.) At the time of said hearing, defendant was 61 years old. The prosecution countered a 25-years-to-life sentence on count 3 would not be cruel and/or unusual punishment given "the facts in this case," i.e., "sexual penetration of a minor ten years or younger." Thereafter, the trial court pronounced:

> "I will expressly adopt the ruling I made at the first sentencing hearing with regards to the cruel and/or unusual punishment argument . . . under the Eighth Amendment to the U.S. Constitution and [a]rticle I, [s]ection [1]7 of the California Constitution to again deny the request t[o] either strike a term or reduce a term with regards to the imposition of sentence. So, the cruel and/or unusual punishment argument again is denied for the same reason as previously stated in the record of the prior sentencing hearing. The circumstances have not changed for the Court to make any reconsideration of that, frankly."

b. *Analysis*

" 'The Eighth Amendment to the United States Constitution applies to the states. [Citation.] It prohibits the infliction of "cruel *and* unusual" punishment. [Citation.] Article I, section 17 of the California Constitution prohibits infliction of "[c]ruel *or* unusual" punishment. [Original italics.] The distinction in wording is "purposeful and substantive rather than merely semantic. [Citations.]" [Citation.] As a result, we construe the state constitutional provision "separately from its counterpart in the federal Constitution. [Citation.]" [Citation.]' [Citation.]" (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*); see *People v. Haller* (2009) 174 Cal.App.4th 1080, 1092 ["Whereas the federal Constitution prohibits cruel 'and' unusual punishment, California affords greater protection to criminal defendants by prohibiting cruel 'or' unusual punishment."].)

### i. California Constitution

"A sentence may violate the state constitutional ban on cruel [or] unusual punishment [citation] if ' ". . . it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' [Citation.]" (*People v. Thongvilay* (1998) 62 Cal.App.4th 71, 87–88.) "In order to determine whether a particular punishment is disproportionate to the offense for which it is imposed, we conduct a three-pronged analysis. [Citations.] First, we examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. A look at the nature of the offense includes a look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts. A look at the nature of the offender includes an inquiry into whether 'the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' [Citation.] Next, we compare the challenged punishment with the punishment prescribed for more serious crimes in the same jurisdiction. And finally, the challenged punishment is compared with punishment for the same offense in other jurisdictions." (*Id*. at p. 88.) "This three-pronged analysis provides guidelines for determining whether a punishment is cruel or unusual. The importance of each prong depends on the facts of each case." (*Ibid*.)

" 'Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17, the validity of enactments will not be questioned 'unless

11.

their unconstitutionality clearly, positively, and unmistakably appears.' " [Citation.]'
[Citation.]" (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1390.)

" 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' [Citations.]" (*People v. Rhodes*, *supra*, 126 Cal.App.4th at p. 1390.)

### 1. Nature of the offense and the offender

On count 3, defendant was convicted of sexual intercourse with Jane, a then 10-year-old child. (See *Baker*, *supra*, 20 Cal.App.5th at p. 725 [victim "particularly vulnerable given her age"].) "Along a spectrum ranging from murder, mayhem, and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.' [Citations.]" (*Id.* at pp. 724–725; see *People v. Scott* (1994) 9 Cal.4th 331, 341–342 ["[T]he Legislature has determined that children are uniquely susceptible to 'outrage' and exploitation."]; *People v. Olsen* (1984) 36 Cal.3d 638, 646 ["There exists a strong public policy to protect children of tender years."].) The record demonstrates defendant "instigated" the incident (*People v. Reyes* (2016) 246 Cal.App.4th 62, 88 (*Reyes*)): he removed his clothes and Jane's pants, fondled her, and inserted his fingers and then his penis into her vagina. (See *People v. Mendoza* (2015) 240 Cal.App.4th 72, 79 ["Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis."].) Jane screamed because of the pain. She would later testify this incident and defendant's other abusive acts continue to traumatize her, "indicating at least some level of psychological harm." (*Baker*, *supra*, at p. 725; see *Reyes*, *supra*, at p. 85 [sex crime against minor may inflict "permanent psychological damage"]; *People v. Christensen* (2014) 229 Cal.App.4th 781, 806 (*Christensen*) [lewd conduct on a child "may have lifelong consequences to the well-being of the child"].) After defendant was finished, he told Jane "not to tell anybody." There is no question defendant "acted alone, not cajoled by others"

12.

(*Christensen*, *supra*, at p. 807), his actions "were unprovoked" (*Reyes*, *supra*, at p. 88), and he "was in complete control of the situation" (*ibid*.).

At the time of the offense, defendant was or around 47 years old. He was more a "mature adult" (*Baker*, *supra*, 20 Cal.App.5th at p. 725) than an " 'unusually immature youth' " (*Reyes*, *supra*, 246 Cal.App.4th at p. 88). Yet, notwithstanding the 37-year age gap, defendant admitted he was aroused by Jane since she was at least seven years old and "couldn't help himself" around her. Furthermore, he was her uncle, the brother of her adoptive father. Jane testified she did not enjoy her homelife, primarily due to a poor relationship with her adoptive mother. By contrast, she found solace with defendant, whom she visited regularly and who made her feel "happy to be alive." K.F.'s testimony suggests Jane was "[v]ery compliant" around defendant and willing to do whatever he asked. By engaging in sexual intercourse with Jane as well as other numerous sexual activities when she was between the ages of five and 18, defendant "abused a position of trust . . . ." (*Baker*, *supra*, at p. 725.)

On appeal, defendant claims his lack of criminal history,[8] below-average risk of recidivism, posttraumatic stress disorder stemming from military service, and alcohol and substance abuse issues "militate in favor of finding that his sentence is constitutionally excessive." We find these factors do not offset the aforementioned circumstances. "On the whole, . . . the nature of the offender and the nature of the offense do not establish that the punishment was grossly disproportionate to the crime committed." (*People v. Gomez* (2018) 30 Cal.App.5th 493, 501–502.)

---

[8] Although the record shows defendant "has no known prior criminal record," it also demonstrates he perpetrated sexually deviant acts—including those underlying his convictions on counts 3 and 4—for over a decade. (See *Christensen*, *supra*, 229 Cal.App.4th at p. 807 [lewd acts "committed over a period of years"]; see also *People v. Falsetta* (1999) 21 Cal.4th 903, 911 [" 'secretive nature of sex crimes' "].)

## 2. Punishment for more serious crimes in California

Next, defendant contends his 25-years-to-life sentence on count 3 "wreaks with excessive harshness" when compared with punishments for other crimes. First, he identifies the following crimes "that mandate 15-year to life terms": second degree murder (§ 190, subd. (a)); attempted premeditated murder of a police officer (§ 664, subd. (f)); aggravated sex trafficking (§ 236.1, subd. (c)(2)), and lewd conduct with a child under the age of 14 (§ 288) or continuous sexual abuse of a child under the age of 14 (§ 288.5) by a person with two prior sex offense convictions (§ 667.51, subd. (c)). Next, defendant identifies the following "ghastly offenses" that "receive life sentences, but permit parole before the defendant has served 15 years behind bars" (italics omitted): attempted premeditated murder (§ 664, subd. (a)); torture (§ 206.1); aggravated mayhem (§ 205); assault resulting in the comatose state or paralysis of a child under the age of eight (§ 273ab, subd. (b)); and lewd conduct with a child under the age of 14 where the perpetrator personally inflicted bodily harm upon the victim (§ 288, subd. (i)(1)). Finally, defendant identifies various "other sex crimes involving children that do not result in incarceration for life" (italics omitted): forcible rape of a child under the age of 14 (§ 264, subd. (c)(1)); forcible rape of a child under the age of 14 in concert with another person (§ 264.1, subd. (b)(1)); pandering with a child under the age of 16 by use of violence (§ 266i, subd. (b)(2)); and continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)).

Our judicial inquiry "commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.) " 'Furthermore, great deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses.' [Citation.]" (*Baker*, *supra*, 20 Cal.App.5th at p. 729.)

14.

In our view, "[i]t is well within the prerogative of the Legislature to determine that sex offenses against young children [10 years of age or younger] are deserving of longer sentences than sex offenses against adults [or children older than 10 years of age] or nonsex offenses." (*People v. Gomez* (2018) 30 Cal.App.5th 493, 502; see *Baker*, *supra*, 20 Cal.App.5th at p. 728 [former § 288a and § 288.7 reflect Legislature's intent to increase severity of punishment as a victim's age decreases].) " 'Punishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual.' [Citation.]" (*Baker*, *supra*, 20 Cal.App.5th at p. 727.) A comparison of defendant's 25-years-to-life sentence under section 288.7, subdivision (a) to the penalties cited by defendant "does not suggest this is that 'rarest of cases' in which 'the length of a sentence mandated by the Legislature is unconstitutionally excessive.' [Citation.]" (*Baker*, at p. 730.)

### 3. Punishment for the same offense in other jurisdictions

Defendant "makes no effort to compare his sentence . . . with punishments in other states for the same offense" in his opening and reply briefs. (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231.) We consider this "a concession that his sentence withstands a constitutional challenge" under this prong of the analysis. (*Ibid.*)

### 4. Conclusion

Defendant's indeterminate sentence on count 3 is not " ' "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' [Citation.]" (*People v. Thongvilay*, *supra*, 62 Cal.App.4th at pp. 87–88; cf. *In re Lynch* (1972) 8 Cal.3d 410, 413 [former statute's aggravated penalty of one year to life for second-offense indecent exposure constituted cruel or unusual punishment due to unreasonably high maximum term].)

ii. Federal Constitution

"The Eighth Amendment to the federal Constitution contains a 'narrow proportionality principle' that applies to noncapital sentences by which a court determines whether a sentence constitutes cruel and unusual punishment. [Citation.] ' "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." [Citation.]' [Citation.] To apply this principle, courts compare the gravity of the offense with the magnitude of the penalty. [Citation.]" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296.)

In light of our conclusion defendant's sentence did not violate our state's constitutional prohibition against cruel or unusual punishment, which "affords greater protection" than its federal counterpart (*People v. Haller*, *supra*, 174 Cal.App.4th at p. 1092), we necessarily find defendant's sentence on count 3 is not grossly disproportionate to his crime.

## II. The Attorney General concedes defendant is entitled to additional custody credits.

At the December 12, 2023 resentencing hearing, the trial court awarded 1,847 custody credits: (1) 812 credits for actual time served between March 21, 2019, and June 11, 2021; (2) 122 conduct credits (§ 2933.1); and (3) 913 credits for actual time served between June 12, 2021, and December 12, 2023.

On appeal, defendant contends his "presentence credit award is erroneous as a matter of law and must be corrected to his benefit." (Boldface & capitalization omitted.) The Attorney General concedes "the trial court erred in calculating presentence custody credits" and asserts the court should have awarded three additional days, increasing the total to 1,850 custody credits: (1) 814 credits for actual time served between March 21, 2019, and June 11, 2021; (2) 122 conduct credits (§ 2933.1); and (3) 914 credits for

actual time served between June 12, 2021, and December 12, 2023.  We accept this concession.

**DISPOSITION**

The trial court is directed to (1) prepare an amended abstract of judgment reflecting a total of 1,850 custody credits, comprised of 814 credits for actual time served between March 21, 2019, and June 11, 2021; 122 conduct credits pursuant to section 2933.1; and 914 credits for actual time served between June 12, 2021, and December 12, 2023 (see *People v. Mitchell* (2001) 26 Cal.4th 181, 185); (2) transmit certified copies thereof to the appropriate authorities; and (3) correct the December 12, 2023 minute order to conform with the amended abstract of judgment (see *People v. Moses* (2011) 199 Cal.App.4th 374, 380).  In all other respects, the judgment is affirmed.