Filed 12/4/24  P. v. Garcia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEVE GARCIA,<br><br>    Defendant and Appellant. | F084331<br><br>(Super. Ct. No. MCR059608)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Mitchell C. Rigby, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Steve Garcia appeals following his conviction on one count of battery (Pen. Code,[1] § 242; count 1), two counts of sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); counts 2, 3), one count of oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b); count 4), and three counts of committing a forcible lewd act upon a child under age 14 (§ 288, subd. (b)(1); counts 5, 6, 7). Appellant challenges his conviction on the grounds that the prosecutor committed misconduct during closing arguments and the jury was improperly instructed. Appellant also challenges his sentence, arguing it constitutes cruel and unusual punishment. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The issues in this appeal focus upon claims of prosecutorial misconduct, improper jury instructions, and the nature of appellant's sentence. Accordingly, we initially provide a high-level summary of the facts presented at appellant's trial and raise additional relevant facts in the course of discussing each of the issues raised by appellant.

Appellant was charged with seven counts based on allegations he sexually abused three different nieces, S.G., J.G., and A.G., over the course of several years. S.G. was the first to disclose allegations of abuse. By the time of trial, S.G. was 23 years old. In her testimony, S.G. detailed incidents that occurred when she was as young as five years old that involved appellant touching her bottom or forcing her to touch his penis and lasted until she was 11 or 12 years old. During the later years, the behavior escalated to appellant placing his mouth on, penis around, or fingers in S.G.'s vagina and attempting to engage in anal sex or acts similar thereto.

S.G. first disclosed the abuse in a letter to her father. S.G.'s father shared the letter with E.G. (S.G., J.G., & A.G.'s mother) who then conducted a further investigation into potential acts with J.G. and A.G. When E.G. questioned J.G. and A.G. about potential

---

[1]    Undesignated statutory references are to the Penal Code.

2.

abuse, they began to cry and allegedly admitted they were touched by appellant. E.G. then called the police resulting in further investigation.

The resulting police investigation developed claims of abuse by J.G. and A.G. J.G. initially alleged appellant had made her touch his penis with her hands and mouth. A.G. disclosed that appellant had undressed her and touched her, including by rubbing his penis against her buttocks. This occurred when A.G. was between four and six years old. At some point, additional abuse was apparently alleged to have occurred to appellant's nephew, Juan G., although details were not disclosed at trial.

At trial, both J.G. and A.G. further detailed their allegations. J.G. was 17 years old at the time of the trial. J.G. testified she was touched inappropriately, starting when she was in kindergarten and lasting until she reached fourth grade. Appellant allegedly touched his penis on or in her mouth, butt, and vagina on a nearly daily basis. In some incidents, appellant would take pictures of the abuse. J.G. stated appellant told her if she didn't "do these things," she and her family would be kicked out of the house and they would have to live on the streets. A.G. was 14 years old at the time of trial. A.G. alleged she was abused multiple times while in elementary school. A.G. stated appellant touched her vagina and anus with his fingers and placed his penis on her body, near or in her vagina.

The defense contested all claims of abuse and presented evidence that there were few, if any, times where appellant would have been fully alone with any of the alleged victims, that relevant family members, parents, and caregivers had not noticed any abuse or any signs of abuse, and that appellant and the victims were all seen together in positive interactions over the course of the alleged abuse. A defense expert found alleged problems with how the investigation's interviews occurred, and upon reviewing additional records, ultimately concluded he could not find anything that pointed to a history of sexual abuse, PTSD, or other consequences of sexual abuse. And appellant testified himself, acknowledging he babysat and played with the victims but denying any

3.

abuse occurred. The defense attempted to ascribe a motive to the accusations by noting that S.G. had a previous intimate relationship with appellant's former girlfriend and had disclosed the abuse to induce appellant and his girlfriend to break up so that S.G. could rekindle that relationship.

The trial in this case lasted 32 days. At the conclusion, appellant was convicted of counts 2 through 7 as charged and of the lesser included offense of battery for count 1, as noted above. Appellant was eventually sentenced to time served on count 1, plus 140 years to life based on a consecutive sentencing decision providing for 15 years to life on count 4 and 25 years to life on each of counts 2, 3, 5, 6, and 7. This timely appeal followed.

## DISCUSSION

Appellant raises several issues related to procedural aspects of his trial and sentencing. First, appellant claims a violation of his due process rights arising out of claims of prosecutorial misconduct during closing arguments. Second, appellant raises two related claims regarding the jury instructions provided in this case, alleging in both incidents that the instructions are improper. Third, appellant contends that his overall sentence constitutes cruel and unusual punishment due to the court's discretionary imposition of consecutive sentences for all counts. We consider each in turn.

### *Prosecutorial Misconduct Claim*

Appellant claims that prejudicial prosecutorial misconduct occurred in this case relating to statements made about a potential witness who did not testify at trial. Upon review, we find no misconduct occurred.

*Relevant Facts*

Appellant's allegations of prosecutorial misconduct focus upon statements made during closing arguments about an uncalled potential witness and victim, Juan, who had been the subject of several pretrial disputes and had been infrequently referenced during

the trial. For context, we review those issues before recounting the contested statements made during closing.

Juan's potential testimony was first challenged through a pretrial motion to exclude his proposed testimony from the trial. Appellant argued any testimony was irrelevant and unduly prejudicial. The court denied this motion.

During voir dire, the court included Juan in the list of potential witnesses disclosed to those in the jury pool for determining pre-existing contact and showed them a picture of Juan. Similarly, in the opening jury instructions, Juan was included in a list of anonymized witnesses that also referenced S.G., J.G., and A.G. During opening arguments, the prosecution made three brief references to Juan. In the first, the prosecutor included Juan in a named list of appellant's nieces and nephews, which also included S.G., J.G. and A.G. In the second, following immediately after the first, the prosecutor stated, "And [appellant], in that particular house … had his own room. And in that particular room is where [A.G.], [J.G.], [S.G.], and Juan all allege over time a variety of acts of sexual abuse occurred that were committed by [appellant]." And in the third, after recounting how S.G.'s disclosure of abuse led to the present case, the prosecutor stated, "And now we are here at the jury trial for you to listen to the evidence and to decide whether or not [appellant] is guilty of the crimes alleged in regards to [S.G.], [A.G.], and [J.G.], and also to decide whether or not it occurred in regards to Juan."

As a member of the family involved, Juan was referenced regularly and throughout the trial as someone present at various events and living in the home. In some instances, such as testimony by S.G., Juan was identified as disclosing or discussing potential abuse. With respect to Juan's state of mind, his mother, E.G., noted during direct examination that she had seen Juan the week before her testimony and that "[h]e was upset. He didn't want to do any of this. He didn't want to come back to this again." Similarly, Detective Brian Majors noted that he had spoken with Juan a few days before

testifying. At that time, Juan "was very emotional and appeared visibly shaken," and Juan had not responded to recent text messages.

Despite having been identified as a potential witness and referenced regularly, as the trial closed it became clear in housekeeping discussions that Juan was resisting any requests to appear and may not testify. Ultimately, Juan did not appear as witness.

In her lengthy closing argument, the prosecutor only mentioned Juan in passing, such as noting that certain highlights were "rendered moot because Juan is not here," that Juan had been interviewed in the investigation, or that Juan, like others, had allegedly been present at certain incidents charged in the case. In the defense's closing argument, Juan was also brought up a few times. He was noted as one of those interviewed by the police and who claimed to be molested. He was noted as someone identified by E.G. as a victim after police allegedly told E.G. that more victims made a better case. And he was again identified as someone present at some of the charged incidents. Most significantly with respect to this appeal, near the conclusion of his closing argument and when discussing the role of circumstantial evidence, the defense argued: "For example, where is Juan? What happened to him? Per the Government's questioning of [Detective] Majors, the Government would have you believe that [Juan] is so traumatized from his experience that he couldn't bring himself to come to court. Well, that is one interpretation. And another interpretation is that he can no longer go along with this farce and charade."

In rebuttal, the prosecutor spent a substantial portion of the argument walking through testimony from each witness and discounting defense theories. During that course, the prosecutor made the following contested statement about Juan: "The Defense brought up Juan. The only evidence that you have about Juan is, A, he was interviewed; B, he was in Madera at one point in time; C, he spoke to Detective Majors and myself at one point in time and had a certain emotional response that Detective Majors testified to; and then, D, he is no longer in Madera. That is the only evidence that you have. There is

more information.  That is correct.  It's not in evidence.  You can't consider what you think might have happened or what the Defense is trying to create as to what happened.  If you want answers about that, they can come sometime later after a verdict is returned, but right now the only evidence is what I told you.  He was here, and now he is gone."  The prosecutor then proceeded in recounting the evidence and disputing defense theories.

After the prosecutor's argument, the defense requested a side bar and noted their concern about the "comment about Juan in that the jury could recontact or have—find out additional information after the verdict."  The defense requested an admonition that the jury should not speculate in that way.  The court noted the jury could in fact speak with anyone they want to after the verdict, found no error or potential prejudice in the statement, and denied the request.

*Standard of Review and Applicable Law*

"As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion."  (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)  "Prosecutorial misbehavior 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citation.]  But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' "  (*People v. Rhoades* (2019) 8 Cal.5th 393, 418.)

Relevant to the arguments raised, it "is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence."  (*People v. Mendoza* (2016) 62 Cal.4th 856, 906.)  Likewise, "[i]mpermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it."  [Citation.]  Similarly, it is misconduct "to suggest that evidence available to the government, but not

7.

before the jury, corroborates the testimony of a witness." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1207, first bracketed in insertion added.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667, second bracketed insertion added.)

*The Prosecutor's Statements Were Acceptable Commentary*

Before reaching the merits, we note that the People argue this claim has been forfeited. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Such an objection was made here. Very shortly after the contested statement was made, appellant's counsel requested a side bar and specifically raised a concern with the prosecutor's argument on the same grounds made on appeal, seeking a curative instruction. While not prefaced with a formal statement of objection, we conclude raising the issue in this manner properly preserved it for appeal.

Upon review of the merits, however, this court finds no error. Appellant argues that the prosecutor referred to facts outside of the record and, impliedly, vouched for her own witness when she discussed Juan's failure to testify. More specifically, appellant contends reversible error arose because the prosecutor argued that "if the jurors wanted an explanation [for Juan not testifying], they could talk to her after the verdict was returned." This framing is not well supported.[2]

---

[2]     The People provide a quoted citation to the rebuttal argument. However, in their recitation, they use ellipses to excise the commentary that is clearly the closest to crossing into improper conduct, the statement: "That is the only evidence that you have. There is more

When reviewed directly, and in context, the prosecutor's statements are not reasonably interpreted in the manner appellant contends. Rather, although not perfectly conveyed, the prosecutor's statements were not invitations to meet with the prosecutor after the verdict to hear undisclosed evidence, but rather to resolve the case based only on the evidence before the jury and to only seek additional information once that task was complete. In the course of her lengthy closing argument, the prosecutor did not attempt to minimize or otherwise explain away Juan's absence, but rather focused on the evidence that had been presented as sufficient to meet the existing charges. It was then appellant who attempted to have the jury draw inferences from Juan's absence. In response, the prosecutor briefly acknowledged that additional evidence existed regarding Juan's absence but made it clear that the jury could not consider such evidence and must conduct their deliberations based on what was before them.

Although acknowledging information existed which was not before the jury was a tactic with a tangible risk of constituting misconduct, the prosecutor's statements avoided implying that the jury should rely on extrinsic evidence or that the prosecutor had relevant information the jury could obtain later which would bolster her positions. Further, the limited role Juan's allegations played in the trial and in closing arguments suggests any risk of prejudice, to the extent error occurred, was minimal. Accordingly, we find no abuse of discretion by the trial court as there was no reasonable probability the jury understood the prosecutor's statements in an improper manner. (See, e.g., *People v. Lamb* (2024) 16 Cal.5th 400, 438–439 [comments made by prosecutor not improper when interpreted in context as reasonable commentary on tedious nature of jury's duty].)

---

information. That is correct. It's not in evidence." We thus equally note that the People's framing of the issue suffers from this decision.

## _Use of CALCRIM Nos. 1191A and 1191B_

Appellant challenges the use of two jury instructions in this case, CALCRIM Nos. 1191A and 1191B, both of which implement aspects of Evidence Code section 1108. Appellant concedes for both arguments that existing and binding California Supreme Court precedent forecloses his arguments but states he "continues to raise each of the arguments … to preserve them for possible review by our Supreme Court or federal review" and notes that "this court is still free to voice its disagreement" with existing precedent. As appellant notes, this court is bound by existing precedent and thus rejects appellant's claims. This court does not find this case to be an appropriate instance to express any potential disagreements with the existing case law.

_Relevant Facts_

As given at trial, the trial court instructed under CALCRIM No. 1191A as follows:

"The People presented evidence that [appellant] committed the crime of lewd or lascivious act upon a child under age 14 that was not charged in this case. This crime is defined for you in these instructions.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that [appellant] in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of evidence if you conclude that it is more likely than not that the fact is true. One moment.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that [appellant] committed the uncharged offense, you may but are not required to conclude from that evidence that [appellant] was disposed or inclined to commit sexual offenses and, based on that decision, also conclude that [appellant] was likely to commit or did commit sodomy by use of force of a child age 14 or older, sexual

10.

intercourse slash sodomy slash oral copulation of a child age 10 or younger, lewd and lascivious act on a child under age 14 by use of force or fear as charged here.

"If you conclude that [appellant] committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that [appellant] is guilty of sodomy by use of force of a child age 14 or older, sexual intercourse slash sodomy slash oral copulation of a child age 10 or younger, lewd or lascivious act on a child age 14 by use of force or fear. The People must still prove each charge and allegation beyond a reasonable doubt."

Similarly, as given at trial, the trial court instructed under CALCRIM No. 1191B as follows:

"The People presented evidence that [appellant] committed the crimes of sodomy by use of force of a child age 14 or older, sexual intercourse slash sodomy slash oral copulation of a child age 10 or younger, lewd or lascivious act on a child under age 14 by use of force or fear as charged in Counts 1 through 7.

"If the People have proved beyond a reasonable doubt that [appellant] committed one or more of these crimes, you may but are not required to conclude from that evidence that [appellant] was disposed or inclined to commit sexual offenses—based on that evidence, also conclude that [appellant] was likely to commit and did commit the other sex offenses charged in this case.

"If you find that [appellant] committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that [appellant] is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

Notably, the parties discussed CALCRIM No. 1191B prior to its use, and no objection was raised. Similarly, no objection was raised to CALCRIM No. 1191A.

11.

*The Jury Instructions Were Proper*

Appellant contends that CALCRIM No. 1191A violated appellant's due process rights because it permitted the jury to infer guilt based on propensity evidence and because it is inconsistent with other instructions. Appellant concedes, however, that "the California Supreme Court has approved of substantially similar instructions and that this court is required to follow Supreme Court precedent."

We therefore reject appellant's arguments. As explained in *People v. Phea* (2018) 29 Cal.App.5th 583, 608–609, our Supreme Court held in *People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1016, that CALJIC No. 2.50.01, the predecessor to CALCRIM former No. 1191, is a correct statement of the law and does not reduce the prosecution's burden of proof. Appellant's arguments are foreclosed by our high court's analysis and conclusion in *Reliford*. As noted in *People v. Schnabel* (2007) 150 Cal.App.4th 83, 87, "We are in no position to reconsider the Supreme Court's holding in *Reliford* [citation], and by analogy to *Reliford*, we reject [appellant]'s argument regarding the jury instruction on use of his [uncharged] sex offenses." Further, we find no merit to appellant's contention that the instruction is internally inconsistent or inconsistent with other instructions. Rather, as held by our Supreme Court, it is a correct statement of the law. The trial court neither erred nor violated appellant's constitutional rights by instructing the jury with CALCRIM No. 1191A.

Similarly, referring to the use of CALCRIM No. 1191B, appellant "seeks to preserve his federal constitutional claim that allowing a jury to use charged offenses to infer that he committed other charged offenses in the same case violates his due process right[s]." Again, appellant concedes that "this court is bound to follow the precedent set in *People v. Villatoro* (2012) 54 Cal.4th 1152 .… (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)"

In *People v. Villatoro, supra*, 54 Cal.4th 1152 (*Villatoro*), the Supreme Court reasoned that Evidence Code section 1108 allows a jury to draw a propensity inference

12.

from currently charged offenses. (*Villatoro*, at p. 1164.) It concluded the challenged instruction did not "impermissibly lower the standard of proof or otherwise interfere with [the] defendant's presumption of innocence," because the instruction clearly told the jury that a charged offense cannot be used to draw an inference of propensity unless proven beyond a reasonable doubt. (*Id.* at p. 1168.)

Appellant is correct that we are bound to follow California Supreme Court precedent pursuant to *Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at page 455, in concluding the trial court did not err by instructing the jurors they may consider proven similarly charged sex offenses as evidence of appellant's propensity to commit other charged offenses. *Villatoro* makes clear that CALCRIM No. 1191B does not conflict with due process or principles of fundamental fairness. (See *Villatoro, supra*, 54 Cal.4th at p. 1168; *People v. Meneses* (2019) 41 Cal.App.5th 63, 68 [finding *Villatoro* dispositive of the defendant's due process challenge to CALCRIM No. 1191B].) We therefore conclude the trial court did not err in giving CALCRIM No. 1191B.

### *Appellant's Sentence Does Not Constitute Cruel and Unusual Punishment*

Appellant also challenges his sentence under both the federal and state Constitutions as cruel and unusual punishment. Appellant contends that his sentence of 140 years to life is grossly disproportionate to his offenses, particularly given that imposing concurrent sentences on those offenses for which it was eligible would have still resulted in a sentence of 75 years to life. Appellant further argues that his sentence is cruel and unusual because it is impossible to serve and thus excessive. We do not agree.

*Additional Relevant Facts*

As imposed, appellant's sentence in this case comprised five consecutive sentences of 25 years to life (counts 2, 3, 5, 6, 7) and one consecutive sentence of 15 years to life (count 4). The decision to sentence appellant to fully consecutive terms was heavily contested. The People filed an initial brief noting that section 667.61 requires consecutive sentences for counts 5 and 6, but also arguing that all counts could

13.

be and should be ordered to run consecutively. In response, appellant argued that counts 2, 3, and 4 should be ordered to run concurrently because consecutive sentences would amount to cruel and unusual punishment under both the federal and state Constitutions. The People filed a response, identifying a past case where an allegedly similar sentencing structure was imposed and upheld as not constituting cruel and unusual punishment.

The court heard argument on the dispute and considered the positions in imposing its sentence. The court then chose to impose the consecutive sentencing scheme noted.

*Applicable Law*

Challenges under the principles of cruel and unusual punishment generally assert that the imposed punishment is disproportionate to the criminal conduct involved. (See *Graham v. Florida* (2010) 560 U.S. 48, 59.) "Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " (*Ibid.*)

Under federal law, with respect to proportionality challenges involving length of term-of-years sentences "the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." (*Graham v. Florida*, *supra*, 560 U.S. at p. 59.) In this analysis, a "court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.] '[I]n the rare case in which [this] threshold comparison … leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Id.* at p. 60, first & fourth bracketed insertions added.) "Under this approach, the Court has held unconstitutional a life without parole sentence for the defendant's seventh nonviolent felony, the crime of passing a worthless check. [Citation.] In other

cases, however, it has been difficult for the challenger to establish a lack of proportionality." (*Id.* at p. 59.)

"Whereas the federal Constitution prohibits cruel 'and' unusual punishment, California affords greater protection to criminal defendants by prohibiting cruel 'or' unusual punishment. [Citations.] Under the California Constitution, punishment is disproportionate if it 'shocks the conscience' and offends fundamental notions of human dignity, considering the offender's history and the seriousness of his offenses. [Citation.] We first examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. [Citation.] Relevant factors include the facts of the current crimes, the nature of the offenses, aggravating circumstances, violence, whether there are rational gradations of culpability that can be made on the basis of the injury to the victim or to society in general, and penological purposes of the prescribed punishment. [Citation.] Second, we compare the penalty with penalties prescribed in California for different, more serious offenses. [Citation.] Third, we compare the penalty with penalties for the same offenses in other jurisdictions. [Citation.] Our authority is circumscribed by the separation of powers doctrine." (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1092.)

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.)

*Appellant's Sentence Does Not Constitute Cruel and Unusual Punishment*

Under either federal or state constitutional standards, the underlying concept in determining whether a sentence constitutes cruel and unusual punishment in cases similar to this is one of proportionality. Notably, in this case, appellant does not challenge any of the six individual sentences imposed as uniquely cruel or unusual. Nor does appellant challenge the imposition of a consecutive sentencing scheme, provided that the overall sentence is not cruel or unusual. Indeed, appellant affirmatively seeks a sentence of

15.

75 years to life. Rather, appellant contends that a sentence which cannot be served within one's lifetime—here, 140 years to life—constitutes cruel and unusual punishment when a similarly lengthy but potentially servable sentence is within the court's discretion. We do not agree.

We begin by noting that the imposed sentence in this case is not cruel and unusual itself. Appellant was convicted of six independent sexual offenses against children, with some offenses being defined by constituting actions against children age 10 or under and others being against children under age 14. The facts elicited in this case show appellant's victims were as young as age six and were all highly vulnerable family members over which appellant was entrusted with some level of care and responsibility. The acts against the children included sodomy and oral copulation, among other conduct, with secrecy enforced through threats. And the course of conduct is alleged to have spanned multiple years with each of the multiple victims. While appellant is correct that he was relatively young and had no prior criminal history, such factors do not force a conclusion that the substantial and severe criminal conduct uncovered is not worthy of an equally severe sentence.

The decision to sentence appellant to consecutive sentences in such a situation, even assuming a functional life sentence without the possibility of parole, does not infer a gross disproportionality or shock the conscious. Crimes of this nature are severe and impactful to the victims and within the community and thus justifiably warrant long sentences for even a single act. The combination of multiple sentences resulting in life-long punishment is thus not independently cruel or unusual when multiple independent criminal acts occurred. Rather, cases have regularly upheld long sentences based on multiple crimes, even when parole was assumed to be impossible. (See *People v. Haller, supra*, 174 Cal.App.4th at pp. 1087, 1094 [78 year-to-life sentence resulting in parole eligibility at age 119 not cruel and unusual]; *People v. Preciado* (1981) 116 Cal.App.3d

409, 412 ["Mandatory imposition of consecutive sentences for multiple violent rapes does not constitute cruel and unusual punishment."].)

Nor does the fact that three of the acts occurred against a single victim change the analysis. While appellant is correct that counts 2, 3, and 4 were all against the same victim, the charges were not for a single course of conduct. Rather, the charges cover a multiyear and multi-act abuse process for which there is no contention that independent and uniquely chargeable criminal acts did not occur. Had the three charges been appellant's entire conviction, a sentence of 75 years to life would not be inherently disproportional or shock the conscious. That even further acts against other victims were also included in the sentence does not change this conclusion.

Likewise, the fact that California imposes a sentence of 15 years to life for second degree murder does not compel a finding that the sentence here is cruel and unusual. Notably, the law does not "hold as a matter of constitutional imperative that 'no crime can be punished more severely than homicide.' " (*People v. Williams* (2024) 17 Cal.5th 99, 133.) Further, the individual sentences imposed in this case, even those mandating 25 years to life, are not challenged as individually cruel or unusual, only the imposition of those sentences consecutively. The lengthy sentence imposed here is therefore not for a single crime, but for multiple crimes that were committed over a long period of time and in a manner that fell within the sentencing law's discretionary authority to impose consecutive sentences. That the overall sentence in such a situation exceeds the punishment imposed for murder does not indicate a cruel and unusual punishment.

Finally, relying partly on Justice Mosk's dissent in *People v. Deloza* (1998) 18 Cal.4th 585, 600–602, appellant contends that his sentence constitutes cruel and unusual punishment because it is impossible for him or any human being to serve. Again, we do not agree. The California Supreme Court has not held that this is a reason to find that a sentence is cruel and unusual. Moreover, in *People v. Byrd* (2001) 89 Cal.App.4th 1373, our sister court in the Third District rejected a similar argument, explaining: "[I]t is

17.

immaterial that [appellant] cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility parole in an appropriate case does not constitute cruel or unusual punishment .…" (*Id.* at p. 1383.) "Moreover, in our view, a sentence such as the one imposed in this case serves valid penological purposes: it unmistakably reflects society's condemnation of [appellant]'s conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future." (*Ibid.*)

In this case, appellant engaged in a multiyear course of conduct that involved repeatedly molesting and sexually assaulting three young family members. We find no constitutional impediment to the resulting conviction of seven offenses, six of which impose substantial prison time, generating a sentence equivalent to life without the possibility of parole.

**DISPOSITION**

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

SNAUFFER, J.

FAIN, J.*

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18.